# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

-------------------------------------------------------------------X

**STEVEN MAKOWSKY,**

**Plaintiff,**

**-against-**

**COUNTY OF NASSAU; NASSAU COUNTY POLICE DEPARTMENT; NASSAU COUNTY POLICE OFFICERS NICOLE BETTES, JOSEPH CHECCO, and CHRISTOPHER COSTELLO (individually and in their capacity as employees of the Nassau County Police Department); SHERIFF'S DEPARTMENT COUNTY OF NASSAU; JOHN DOES "1&2", (individually and in their capacity as employees of the Sheriff's Department County of Nassau); LAWRENCE-CEDARHURST FIRE DEPARTMENT, INC.; JOSHUA KIRSCHNER, (LCFD) AND DEPUTY CHIEF MEYER ADLER (LCFD) (individually and in their capacity as firefighters and employees of the Lawrence-Cedarhurst Fire Department),**

**Defendants.**

-------------------------------------------------------------------X

Index No.:

Date Purchased:

**SUMMONS**

Plaintiff selects Nassau County as the place of trial.

The basis of venue is where the cause of action arose.

Plaintiff is a resident of Nassau County.

**TO THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to servea copy of your answer, or if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons isnot personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Hauppauge, New York

February 5, 2024

*John C. Theodorellis, Esq.*
John C. Theodorellis, PLLC
Attorney for Plaintiff
150 Motor Parkway, Suite 401
Hauppauge, New York 11788
(631) 787-8569

**TO: NASSAU COUNTY ATTORNEY'S OFFICE**
**One West Street**
**Mineola, NY 11501**

**NASSAU COUNTY POLICE DEPARTMENT**
**1490 Franklin Ave.**
**Mineola, NY 11501**

**POLICE OFFICER NICOLE BETTES, NASSAU COUNTY POLICE DEPT.**
**1490 Franklin Ave.**
**Mineola, N.Y. 11501**

**POLICE OFFICER JOSEPH CHECCO, NASSAU COUNTY POLICE DEPT.**
**1490 Franklin Ave.**
**Mineola, N.Y. 11501**

**POLICE OFFICER CHRISTOPHER COSTELLO, NASSAU COUNTY POLICE DEPT.**
**1490 Franklin Ave.**
**Mineola, N.Y. 11501**

**SHERIFF'S DEPARTMENT COUNTY OF NASSAU**
**100 Carman Avenue**
**East Meadow, NY 11554**

**LAWRENCE-CEDARHURST FIRE DISTRICT, Inc.**
**75 Washington Avenue**
**Lawrence, New York 11559**

**JOSHUA KIRSCHNER (LCFD)**
**8 Waverly Place**
**Lawrence New York 11559**

**MEYER ADLER (LCFD)**
**442 Broadway**
**Cedarhurst, NY 11516**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

-----------------------------------------------------------------------X Index No.:

**STEVEN MAKOWSKY,**

**Plaintiff,**

**-against-**

**VERIFIED COMPLAINT**

**COUNTY OF NASSAU; NASSAU COUNTY POLICE DEPARTMENT; NASSAU COUNTY POLICE OFFICERS NICOLE BETTES, JOSEPH CHECCO, and CHRISTOPHER COSTELLO (individually and in their capacity as employees of the Nassau County Police Department); SHERIFF'S DEPARTMENT COUNTY OF NASSAU; JOHN DOES "1&2", (individually and in their capacity as employees of the Sheriff's Department County of Nassau); LAWRENCE-CEDARHURST FIRE DEPARTMENT, INC.; JOSHUA KIRSCHNER, (LCFD) AND DEPUTY CHIEF MEYER ADLER (LCFD) (individually and in their capacity as firefighters and employees of the Lawrence-Cedarhurst Fire Department),**

**Defendants.**

-----------------------------------------------------------------------X

Plaintiff, **STEVEN MAKOWSKY**, by and through his undersigned attorneys, **John C. Theodorellis, PLLC**, 150 Motor Parkway, Suite 401, Hauppauge New York 11788, as and for his complaint against the Defendants, hereby alleges and states upon information and belief, as follows:

## JURISDICTION AND VENUE

1. The Jurisdiction of this Court is properly invoked under New York Civil Practice and Law and Rules (hereinafter "CPLR") § 301.

2. Venue in the Supreme Court of the State of New York, County of Nassau, is proper pursuant to CPLR § 504(1), CPLR § 503(a) and CPLR§ 503(c).

## PARTIES

3. That at all times herein mentioned Plaintiff **STEVEN MAKOWSKY** (hereinafter also "Plaintiff" or "**MAKOWSKY**") was and is a resident of the County of Nassau, State of New York and a United States Citizen.

4. That at all times herein mentioned Defendant **COUNTY OF NASSAU**, is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York with principal offices located at 1550 Franklin Avenue Mineola, New York 11501.

5. That at all times herein mentioned, Defendant **NASSAU COUNTY POLICE DEPARTMENT** (hereinafter also "**NCPD**") is a governmental subdivision of Defendant **COUNTY OF NASSAU,** duly organized and existing under and by laws of the State of New York, with principal offices located at 1490 Franklin Avenue, Mineola, New York 11501.

6. That at all times relevant Defendants **COUNTY of NASSAU** and **NCPD** own, operate, manage, maintain, employ and or controls the **NASSAU COUNTY POLICE DEPARTMENT.**

7. That at all times mentioned Defendant **NCPD** was an agency acting on behalf of **COUNTY OF NASSAU** to perform police duties and to protect the health, welfare, property and safety of the residents of Nassau County, New York.

8. That at all times herein mentioned, Defendant **SHERIFF'S DEPARTMENT OF NASSAU COUNTY** was a governmental subdivision of Defendant **COUNTY OF NASSAU,** duly organized and existing under and by laws of the State of New York, with principal offices located at 100 Carman Avenue, East Meadow, New York 11554.

9. That at all times relevant Defendants **COUNTY OF NASSAU and SHERIFF'S DEPARTMENT OF NASSAU COUNTY** own, operate, manage, maintain, employ and or controls the **SHERIFF'S DEPARTMENT OF NASSAU COUNTY** including it's Corrections Division and Enforcement Division located in Nassau County, New York.

10. That at all times herein mentioned, Defendant **COUNTY OF NASSAU** employed Defendant **NCPD**, Defendant **SHERIFF'S DEPARTMENT OF NASSAU COUNTY** and their respective employees.

11. That at all times herein mentioned, Defendant **COUNTY OF NASSAU,** Defendant **NCPD**, and Defendant **SHERIFF'S DEPARTMENT OF NASSAU COUNTY** did business in the State of New York.

12. That at all times herein mentioned, Defendant **COUNTY OF NASSAU,** Defendant **NCPD**, and Defendant **SHERIFF'S DEPARTMENT OF NASSAU COUNTY** are responsible for public safety and the safety of persons in their custody in Nassau County.

13. That at all times herein mentioned, Defendant **NCPD OFFICER NICOLE BETTES**, ID# 9661, (hereinafter also **"BETTES"**) was and is a resident of the State of New York and employed by Defendant **COUNTY OF NASSAU** and Defendant **NCPD.**

14. That at all times herein mentioned, Defendant **NCPD OFFICER JOSEPH CHECHO,** ID#10109, (hereinafter also **"CHECCO"**) was and is a resident of the State of New York and employed by Defendant **COUNTY OF NASSAU** and Defendant **NCPD.**

15. That at all times herein mentioned, Defendant **NCPD** officer **CHRISTOPHER COSTELLO,** ID#10734 , (hereinafter also **"COSTELLO"**) was and is a resident of the State of New York and employed by Defendant **COUNTY OF NASSAU** and Defendant **NCPD.**

16. That at all times herein mentioned, Defendants **COUNTY OF NASSAU** and **NASSAU COUNTY POLICE DEPARTMENT** was responsible for the hiring, training, monitoring, conduct and discipline of Defendants **NCPD OFFICERS BETTES, CHECCO, and COSTELLO.**

17. That at all times relevant hereto, Defendants **NCPD OFFICERS BETTES, CHECCO, and COSTELLO** were acting in such capacity as the agent, servant and/or employee of the Defendants **COUNTY OF NASSAU AND NASSAU COUNTY POLICE DEPARTMENT,** and were acting under the color and pretense of the statutes, ordinances, regulations, customs and usages of the State of New York and the

**COUNTY OF NASSAU,** and under the authority of their office as a police officer of the **COUNTY OF NASSAU** and the State of New York. They are sued individually and in their official capacity.

18. That at all times relevant Defendant **SHERIFF'S DEPARTMENT OF NASSAU COUNTY** were responsible for the hiring, training, monitoring, conduct and discipline of its employees.

19. That Defendants **JOHN DOE "#1 & 2"**, were employees of the **SHERIFF'S DEPARTMENTOF NASSAU COUNTY.** They are sued individually and in their official capacity.

20. That Defendants **COUNTY OF NASSAU and NCPD** are vicariously liable for the negligent, intentional, willfully negligent, reckless and malicious acts of its employees and authorized agents including the police officers named herein, Defendants **BETTES, CHECCO, and COSTELLO.**

21. That Defendants **COUNTY OF NASSAU** and **SHERIFF'S DEPARTMENT OF NASSAU COUNTY** are vicariously liable for the negligent, intentional, willfully negligent, reckless and malicious acts of its employees and authorized agents including the officers identified herein as **JOHN DOE #1** and **JOHN DOE #2.**

22. That each and all of the acts of the Defendant police and sheriff's officers named herein, (Defendants **BETTES, CHECCO, COSTELLO, JOHN DOES #1,2)** were done under the pretense of the statutes, regulations, customs and usages of the **COUNTY OF NASSAU** and the State of New York, and under the authority of their office as officers for the **COUNTY OF NASSAU.**

23. That at all times herein mentioned, Defendants **COUNTY OF NASSAU, NCPD**, and Defendant **SHERIFF'S DEPARTMENT OF NASSAU COUNTY** had the duty to ensure that the actions, acts, activities, and behavior of its agents, employees and/or servants, including the Defendant officers herein, (Defendants **BETTES, CHECCO, COSTELLO, JOHN DOES #1,2)** conform to a certain standard of conduct established by law for the protection of others, including the Plaintiff, against unreasonable risk of harm, and were responsible for the appointment, screening, hiring,training, supervision, discipline and retention of their employees.

24. That the Defendants **COUNTY OF NASSAU; NCPD; NCPD OFFICERS BETTES, CHECCO and COSTELLO; SHERIFF'S DEPARTMENT COUNTY OF NASSAU and JOHN**

**DOES "1&2"** are hereinafter also cumulatively referred to herein as the **"NASSAU COUNTY DEFENDANTS."**

25. That at all times mentioned herein Defendant **LAWRENCE-CEDARHURST FIRE DEPARTMENT, INC. (hereinafter also "LCFD")** is a not-for-profit corporation organized under the laws of New York that provides fire protection and other related services to the Villages of Lawrence and Cedarhurst and their surrounds on Long Island, New York with principal offices located at 75 Washington Avenue Lawrence, New York 11559.

26. Defendant **LCFD** also has a Board of Fire Commissioners of the Lawrence-Cedarhurst Fire Department (the "LCFD Board") that is organized under the bylaws of the **LCFD** and has control and general management over the affairs and business of the **LCFD**.

27. That at all times mentions herein Defendant **JOSHUA KIRSCHNER** (hereinafter also "**KIRSCHNER**") resided at 8 Waverly Place Lawrence New York 11559 and was a firefighter with Defendant **LCFD** since approximately November 2014.

28. That at all times mentioned herein Defendant **DEPUTY CHIEF MEYER ADLER** (hereinafter also"**DEPUTY CHIEF ADLER**" resided at 442 Broadway Cedarhurst, NY 11516 and was a Deputy Chief firefighter and executive with Defendant **LCFD** on February 7, 2023.

29. That Defendants **KIRSCHNER** and **DEPUTY CHIEF ADLER** were both entitled to and have received benefits and compensation as a result of them being volunteer firefighters for **LCFD**.

30. That at all times mentioned herein Defendants **KIRSCHNER** and **DEPUTY CHIEF ADLER** were employees, volunteers and/or agents of **LCFD,** hired before February 7, 2023.

31. That at all times mentioned herein Defendant **LCFD** and its **LCFD** Board did business in the State of New York and were responsible for the screening, hiring, training, supervision, retention and conduct of its firefighters including Defendants **KIRSCHNER,** his partner Nicole Diblaso, **(LCFD)** and **DEPUTY**

**CHIEF ADLER.**

32. That Defendant **LCFD** and its Board is also responsible for and were responsible for the disciplining its firefighters and can issue suspensions to Defendants **KIRSCHNER** and **DEPUTY CHIEF ADLER.**

## NATURE OF THE CASE

33. This is an action alleging assault, battery, false arrest and imprisonment, intentional abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, willful negligence, recklessness, negligent supervision, negligent hiring and retention, municipal liability, denial of religious accommodation, all in violation of federal and New York state laws including but not limited to section 1983 of the Civil Rights Act, (42 USC § 1983), 42 USC § 1988, 18 USC 242, Free Exercise Clause of the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment Equal Protection and Due Process Clauses, Eighth Amendment's provisions against cruel and unusual punishment, and Fourteenth Amendments of the Unite States Constitution, and Constitution of the State of New York, New York State Human Rights Law Executive Law § 296, and New York Civil Rights Law §§ 40, 40-c, 40-d, and 41.

34. That this action falls within one or more of the exceptions set forth in CPLR 1602.

35. That pursuant to CPLR section 1602, the Defendants are jointly and severally liable for all of Plaintiff's damages, including but not limited to Plaintiff's non-economic loss, by reason of the facts that Defendants, their agents, servants and/or employees, owed the Plaintiff a non-delegable duty of care; that said Defendants acted with reckless disregard of the Plaintiff and others; that the conduct of the Defendants was intentional; that the Defendants are vicariously liable for the negligent acts and omissions of others, including their agents, servants and/or employees, who caused or contributed to Plaintiff's damages; and that Defendants acted knowingly or intentionally, and in concert, to cause the acts or omissions which are the proximate cause of the Plaintiff's injuries.

## NOTICE OF CLAIM

36. That on May 4, 2023, and within ninety days following the occurrence out of which the claim of the Plaintiff arose, the Plaintiff timely and properly served a notice of claim in writing on the **NASSAU COUNTY DEFENDANTS** in accordance with General Municipal Law § 50e.

37. That Plaintiff complied with the request of the municipal defendants sent by the Office of the County Attorney, County of Nassau for an oral examination pursuant to Section 50-H of the General Municipal Law testifying at a 50-H hearing on November 13, 2023.[1]

38. That this action is commenced within one year and ninety days after the cause of action arose.

39. That more than 30 days have elapsed since the aforesaid Notice of Claim was served on the Defendants.

40. That the Defendants have not settled, adjusted or paid said claim.

41. That all conditions and requirements precedent to the commencement of this action have been complied with.

## FACTS AND CIRCUMSTANCES

42. On the morning of February 7, 2023, at approximately 8:20am., **PLAINTIFF MAKOWSKY** a religious and practicing jew, married father, local business owner, and resident of Nassau County was alone in his car in his business office parking lot located at 557 Willow Avenue, Cedarhurst New York, County of Nassau, State of New York.

43. Simply put, on February 7, 2023, Plaintiff **MAKOWSKY,** was threatened, menaced, assaulted, battered, menaced and harassed by Defendant **KIRSCHNER,** who for no legitimate reason followed Plaintiff to his place of business located at 557 Willow Avenue, Cedarhurst New York, County of Nassau, State of New York in an **LCFD** SUV vehicle.

[1] Video evidence from cameras and police body cameras was provided to the Nassau County Attorney at the 50-H hearing.

44. The maltreatment and wrongful acts committed against **PLAINTIFF MAKOWSKY,** by the all Defendants, was in stark contrast to the treatment given to **DEFENDANT KIRSCHNER** who was never disciplined or charged for his tortious and criminal acts against Plaintiff.

45. Earlier that morning, Plaintiff **MAKOWSKY** had been inside a coffee/cheese store located At 532 Central Ave, Cedarhurst New York near his office when Defendant **KIRSCHNER,** a volunteer firefighter for **LCFD** entered the shop from the front street entrance.

46. Plaintiff **MAKOWSY** and Defendant **KIRSCHNER** were prior litigants in a civil case related to construction work done on **PLAINTIFF's** house by **KIRSCHNER**.

47. Defendant **KIRSCHNER** had previously harassed and shown animosity towards Plaintiff and his wife.

48. Defendant **KIRSCHNER,** who is much physically larger than Plaintiff, walked near and around Plaintiff when he was in the store.

49. Plaintiff **MAKOWSKY** left the store out the back parking lot entrance of the coffee shop and Drove to his place of business nearby on Willow Avenue.

50. On the same morning of February 7, 2023, Defendant **KIRSCHNER** was driving a large White **LCFD** SUV vehicle, #3281 with his **LCFD** partner Nicole Diblasio in the passenger seat.

51. That Defendant **KIRSCHNER** was driving the white **LCFD** SUV vehicle with the permission of and authority of Defendant **LCFD**.

52. As captured on video footage, after Plaintiff **MAKOWKSY** left the coffee shop out the back, Defendant **KIRSCHNER** left the coffee shop by the front entrance and entered the **LCFD** SUV parked on Central Avenue.

53. The **LCFD** firehouse is located at 75 Washington Ave Lawrence New York at 11559 and is at the corner of Central Avenue and Washinton Avenue and is to the West of the coffee shop.

54. As additionally captured on video footage, Defendant **KIRSCHNER** quickly made an illegal U-turn on Central Avenue and proceeded easterly on Central Avenue.

55. Defendant **KIRSCHNER** then drove the vehicle at a high rate of speed Easterly in the opposite direction of the **LCFD** fire house.

56. Defendant **KIRSCHNER** then made two left turns and sped down Willow Avenue, toward the location of Plaintiff's place of business.

57. Willow Avenue is a single lane one-way road with westerly flow of traffic.

58. Defendant **KIRSCHNER** quickly sped to Plaintiff's place of business pulling his **LCFD SUV** over to the left side of the one-way road blocking and trapping Plaintiff who was still in his car.

59. That Defendant **KIRSCHNER LCFD** SUV vehicle is much larger, heavier, wider and higher than Plaintiff's car.

60. Defendant **KIRSCHNER** then screamed and cursed at Plaintiff, and made threats against him including but not limited to threats to kill and destroy Plaintiff.

61. During the encounter Defendant **KIRSCHNER's** vehicle was so close to Plaintiff that he spat on Plaintiff from his higher position and Plaintiff believed Defendant **KIRSCHNER** would exit his vehicle and further attack him.

62. That the actions of Defendant **KIRSCHNER** placed Plaintiff in fear of imminent physical injury and harm and he was subjected to unwanted contact being spat upon.

63. That while trapped by Defendant **KIRSCHNER**, Plaintiff's coffee splattered on both his own car, himself and the much higher SUV.

64. That Plaintiff was on the phone with his wife during the incident and she proceed to leave her home in a panic to Plaintiff's office.

65. That Plaintiff called 911 at approximately 8:22am to report the threats and harassment and entered his building to get away from Defendant **KIRSCHNER**.

66. That Defendant **KIRSCHNER** moved the SUV vehicle, put on its lights, and was standing outside of it with lights flashing when the Defendant police officers **BETTES, CHECCO, AND COSTELLO** named herein from the **NCPD** 4th precinct, arrived.

67. That after 911 was called to report the assault of Plaintiff **MAKOWSKY** by Defendant **KIRSCHNER**, Plaintiff **MAKOWSKY** was immediately and painfully handcuffed inside his own office building by Defendant NCPD officer **BETTES**, interrogated by Defendants **BETTES, CHECCO** and **COSTELLO (hereinafter also "NCPD Officers")** in front of his wife and business partners while handcuffed and without miranda warnings, arrested, and then charged with criminal offenses.

68. Indisputable body cam footage recorded that Defendant **KIRSHNER** knew and was friendly with Defendant **NICOLE BETTES** whom he referred to as "Nikki" when she responded to the scene.

69. Defendant **NICOLE BETTES** immediately entered Plaintiff's business climbed the stairs to Plaintiff's office and handcuffed behind his back at 8.27am, before Officer Bettes had conducted any interviews or investigation.

70. That Plaintiff was charged with criminally assaulting defendant **KIRSCHNER** with splashed coffee despite the fact Defendant **KIRSCHNER** is on bodycam video initially stating to the **NCPD Officers** that he was not injured by Plaintiff and that it is cold out.

71. Plaintiff was not offered and did not require medical attention as a result of contact with the same splashed coffee.

72. It is only after being prodded by the **NCPD Officers** captured on bodycam that Defendant **KIRSCHNER** then alleged he had some pain from the coffee that splashed on him and Plaintiff.

73. That Defendant **KIRSCHNER** further refused treatment by an outside ambulance or medical provider and stated his own **LCFD** people would look at him.

74. Both Defendant **KIRSCHNER** and his partner Desibio also lied on camera that they were driving to the **LCFD** firehouse which is clearly refuted by available video evidence.

75. After establishing that both Plaintiff and Defendant were in a coffee shop prior to the incident, that Plaintiff and his wife were alleging that Plaintiff was followed, threatened, menaced and assaulted, there was no attempt by police to further question Defendant Kirschner as to why he had driven the route he did to Plaintiff's place of business, look at any street video, or question **KIRSCHNER** about threats made to

Plaintiff.

76. In sharp contrast, Plaintiff was interrogated and repeatedly questioned for a length of time while in handcuffs with his hands behind his back.

77. That Defendant **DEPUTY CHIEF ADLER** is captured on video outside of Plaintiff's business following the assault by Defendant **KIRSCHER** with other **LCFD** officials speaking to the **NCPD Officers**.

78. That the **NCPD officers** ignored Plaintiff's and his wife's demands for charges against Defendant **KIRSCHNER** even though they repeatedly informed him in detail of Defendant **KIRSCHNER**'s history and actions and that it was completely obvious that Plaintiff had been followed and assaulted outside his own place of business.

79. That police bodycam video recorded defendant **DEPUTY CHIEF ADLER** approach the Defendant **NCPD Officers** and demand enhanced charges against Plaintiff **MAKOWSKY**, in **MAKOWSKY**'s presence while **MAKOWSKY** was handcuffed, and being placed in an **NCPD** police vehicle.

80. That the **NCPD Officers** then improperly turned off their body cameras and engaged in further conversation with Defendant **DEPUTY CHIEF ADLER** in violation of NCPD rules and regulations.

81. Additionally, the Defendant **NCPD officers** improperly and in a biased, intentional and reckless manner:

a. Failed to conduct a proper investigation of Defendant **KIRSCHNER**'s actions;

b. Failed to review video evidence which was readily available;

c. Reminded Defendant **KIRSHNER** and Diblasio that they are being recorded by bodycam;

d. Failed to keep their body cameras on and turning them off and on;

e. Asked questions and coaxed responses out of Defendant **KIRSCHNER** in a manner to support criminal charges against Plaintiff;

f. Failed to ask questions or follow up questions from Defendant **KIRSCHNER** or his partner DiBlasio that readily would have elicited facts against Defendant **KIRSCHNER** demonstrating his misconduct;

g. Improperly charged Plaintiff with a felony criminal mischief charge, which charge requires facts demonstrating criminal *intent* (emphasis added) to destroy property, in this case (a radio inside the SUV);

h. Prepared and signed paperwork containing false statements and exaggerated statements of painful injury to **KIRSCHNER** support criminal charges;

i. Purposely avoiding or omitting facts in questioning or paperwork favorable to Plaintiff and his Defense;

j. Not issuing a Desk Appearance to Plaintiff;

k. Slow walking the preparation of charges and transport of Plaintiff knowing Plaintiff would have to spend the night in jail.

82. At the 4th precinct, Defendant **CHECCO,** was on the phone with LCFD officials including Thomas Foy and Defendant **DEPUTY CHIEF ADLER.** Defendant **CHECCO** attempted to bring felony charges against Plaintiff and the paperwork was changed and done over until a felony charge of Criminal Mischief in the Second Degree for damage to a radio was included in the arrest charges (2023AR501674) and criminal complaint along with misdemeanor Assault charges, (Complaint CR-002661-23NA which was ACOD'd.) .

83. That NCPD paperwork such as the Arrest Report for Plaintiff with **OFFICER BETTES** listed as "reporting officer" contains the false and misleading statements such as that Plaintiff called Defendant **KIRSCHNER** a "dog" in the cheese shop, that Defendant **KIRSCHNER** was "driving back to the firehouse when he encountered defendant Makowsky" and that the "victim" **KIRSCHNER** was in "7 out of 10 pain" to his face although he first denied injury and there is no injury to him on the bodycam video.

84. The Arrest Report merely indicates that Defendant **KIRSCHNER** "argued" with Plaintiff and makes no mention of important details such as the incident location was at Plaintiff's place of business, and defendant **KIRSCHNER'S** trapping, spitting and threats to Plaintiff.

## NEW YORK STATE ATTORNEY GENERALS PRIOR INVESTIGATION INTO NCPD AND BETTES

85. Defendant **BETTES** and other Nassau County officers were previously the subjects of an investigation by the Special Investigation and Prosecutions Unit of the New York State Attorney General ("**NYSAG**") involving the death of an unarmed civilian. See *Report on the Investigation into The Death of Walter Perez*, (**Exhibit A**).

86. According to the **NYSAG**'s report, on Saturday, September 23, 2017, Walter Perez died following an interaction with members of the Nassau County Police Department ("**NCPD**") in which he was repeatedly tased with tasers. *Report on the Investigation into The Death of Walter Perez*, (**Exhibit A, page 1**).

87. In total, two officers used their tasers a total of 13 times for a total of approximately 66 seconds. (**Exhibit A, page 1**). "PO Bettes then deployed her taser, striking Mr. Perez in the chest and abdomen area. Once the taser dart-probes were embedded into Mr. Perez skin, PO Bettes activated her taser seven times." (**Exhibit A, page 6**).

88. Additionally, the NYSAG's report states, "Based upon an interview of PO Bettes and the electronic data generated by her taser, PO Bettes activated her taser in dart-probe mode seven times and the duration of each activation ranged between four to six seconds, for a total of approximately 36 seconds" citing an "AXON Taser Information Report dated February 16, 2018, for Taser Serial No. X13001RP9 - issued to Officer Bettes." (**Exhibit A, page 6-7**).

89. After investigation, the NYS Attorney General made several Policy Recommendations:

> "The OAG recommends that the NCPD: • Continue to implement and review methods to defuse incidents involving individuals who appear to be experiencing excited delirium or a mental health crisis. • Develop training programs cautioning NCPD officers concerning deployments of multiple tasers simultaneously against the same civilian and multiple use of one taser consecutively for a prolonged period. • Outfitting NCPD officers with body-worn cameras and equipping tasers with cameras." **Exhibit A, page 11**.

90. In their call for Policy Changes by the **NCPD**, including "Additional Training on Taser

"Deployment" it was found that "Officers Moran and Bettes activated their tasers simultaneously, multiple times, and each consecutively for a period of approximately 66 seconds. *This application of multiple tasers repeatedly for an extended period appears to have violated departmental policy*." (Emphasis added), **Exhibit A, page 12.**

91. Although declining to criminally prosecute Defendant **BETTES** the NYSAG investigative report states with regard to her and a second officer, "Nevertheless, the NCPD should take whatever actions it deems necessary to address the officers' violation of OPS #12430, *including significant additional training*." (Emphasis added). (**Exhibit A, page 13**).

92. As a result of this investigation the NYSAG repeated the importance of bodycam video as a needed and required change by Defendant **NCPD**. "We have previously issued four reports recommending that police departments equip officers with body-worn and/or dashboard cameras.... Indisputably, videotaped evidence would have greatly facilitated the investigation of this case." **Exhibit A, page 13**.

93. After much public outcry regarding continuing police encounters with civilians on June 12, 2020, Hon. Mario Cuomo, Governor of the State of New York signed NYS Executive Order 203 requiring each local government in the State to adopt a policing reform plan by April 1, 2021.

94. This ultimately led to Defendant **NCPD** adopting Department Procedure OPS 6420 concerning Body-Worn Cameras effective July 19, 2022, which states in part

> " The policy of the Police Department is to recognize the need to increasingly utilize audio-video technology to further the mission of the Department. The use of a Body-Worn Camera system will improve the Department's ability to objectively document law enforcement interaction with the public by providing recorded evidence of actions, conditions, and statements."
>
> Members of the Force will activate the body-worn cameras (BWCs) [See Definition] when such use is appropriate to the proper performance of their official duties, where the recordings are consistent with this policy and law." (**See Exhibit C.**)

95. According to OPS 6420 rules concerning body worn cameras:

> 1. Members of the Force will use BWCs in accordance with Department policies and state laws.
>
> 3. Only trained, assigned, and authorized personnel will be required to use BWCs during their assignments.

> 11. BWCs will be deactivated immediately prior to entering a police facility, except in the case of an arrest. When accompanying a prisoner into a police facility, *members will continue recording until the prisoner has been lodged for arrest processing*.(emphasis added). See **Exhibit C**, Department Procedure OPS 6420, Rule 13.

96. Additionally, " A member who fails to activate [See Definition] his/her BWC for any incident [See Definition] according to Department policies and rules, whether intentionally or Body-Worn Cameras unintentionally, will report the failure to record to his/her supervisor as soon as practical" See **Exhibit C OPS 6420, PAGE 6 of 11**.

97. According to OPS 6420, the definition of "Incident: an encounter which requires some degree of law enforcement action or response. For the purposes of this procedure, an incident will have concluded when a member has cleared the scene and given a disposition, or has completed transport of a civilian or arrestee." See **Exhibit C OPS 6420, PAGE 6 of 11.**

98. The Defendant **NCPD officers** turned their body cam cameras off in violation of NCPD rules including but not limited to provisions of Procedure OPS 6420. (See **Exhibit C**). Upon information and belief, the personnel files, records and disciplinary histories of the **NCPD officers, KIRSCHNER, ADLER and JOHN DOE #1, #2** Defendants will reveal a history of Constitutional violations indicative of Defendants, including knowledge that the individual officer Defendants were unfit for employment and that the probability of the individually named Defendants committing similar violations in the future was extremely high.

99. Further, there is no question that Plaintiff was immediately and painfully handcuffed by Defendant **BETTES** prior to **NCPD officers** investigating the circumstances while completely ignoring other available video evidence that was readily available at the scene.

**CONTINUING WRONGFUL ACTS AGAINST PLAINTIFF DUE TO HIS RELIGION**

100. That the mistreatment of Plaintiff continued after his arrest. Plaintiff, who wears a Yarmulke head covering as part of his Jewish religion, made several requests after being jailed and imprisoned that he be given or allowed to receive Kosher food from his wife that were denied by the Defendant **NCPD officers** at the

4th Precinct and by Defendant **John Doe #1 and #2** employees of Defendant **SHERIFFS' DEPARTMENT OF NASSAU COUNTY**. Additionally, Plaintiff missed his morning prayers at temple the following morning.

101. Instead of Kosher food, Plaintiff was offered only non-kosher bologna while he was in custody By John Doe #1, and John Doe #2 at the Sheriff's Department knowing that Claimant was Jewish and making jokes at his expense and related to his religion when Plaintiff revealed he was hungry and had not eaten the next day.

102. That as a result of false claims and charges against Plaintiff, Plaintiff was forced to attend criminal court proceedings on different dates and hire a criminal defense attorney to protect his rights,

103. That all criminal charges against Plaintiff have now been ACOD'd for dismissal, (Adjournment in Contemplation of Dismissal) under CPL 170.55.

**LACK OF ACCOUNTABILITY BY THE DEFENDANTS FOR THEIR TORTIOUS ACTS**

104. That Defendant **KIRSCHNER** walked about freely in the street with impunity after assaulting Plaintiff talking to the **NCPD officers** and **LCFD** officials who covered his back after the assault of Plaintiff. Defendant **KIRSCHNER** was never handcuffed, arrested or charged for his menacing, assault, battery and harassment of Plaintiff.

105. The cover up and wrongful acts of the Defendants acting in concert to protect defendant **KIRSCHNER** and the **LCFD** and cause maximum harm to **PLAINTIFF** are greater than the original crimes committed by Defendant **KIRSCHNER.**

106. That even after the charges were ACOD'd, Defendants **KIRSCHNER AND DEPUTY CHIEF ADLER** still were not disciplined for their actions.

107. To the contrary, as posted by **LCFD** on Facebook, when **LCFD** held its annual swearing in ceremony for *executive staff* (emphasis added) on December 31, 2023, **DEPUTY CHIEF MEYER ADLER** was sworn in with Defendant **KIRSCHNER** who was now bestowed with the title "**COMMISSIONER JOSHUA KIRSCHNER**". (See **LCFD** webpages, **Exhibit B**).

108. That the three Defendant **NCPD officers,** Defendant **KIRSCHNER,** Defendant **DEPUTY CHIEF ADLER** and **John Doe #1, and John Doe #2** had the duty to maintain and ensure that their actions, acts activities and behavior conformed to certain a certain standard of conduct established by law for the protection of others, including the Plaintiff against unreasonable risk of harm.

109. That the three Defendant **NCPD officers,** Defendant **KIRSCHNER ,** Defendant **DEPUTY CHIEF ADLER** actively and **John Doe #1, and John Doe #2** had the duty to conduct themselves in such a manner so as not to intentionally, wantonly, and/or negligently cause injuries to others, including the Plaintiff.

110. That the three Defendant **NCPD officers,** Defendant **KIRSCHNER ,** Defendant **DEPUTY CHIEF ADLER** acted maliciously in conspiring to arrest the Plaintiff, charging the Plaintiff criminally and the Defendants took no steps to properly train their employees in applicable provisions of the New York City and State Law Enforcement Law, correct the abuse of authority, or to discourage their unlawful use of authority despite actual and constructive notice of the conduct of said employees.

111. That the actions of Defendant **KIRSCHER, NCPD Officers** and **DEPUTY CHIEF ADLER,** violated their duty of care owed to Plaintiff and caused Plaintiff fear, pain, anxiety, emotional distress and alarm.

112. That the actions of the Defendants caused Plaintiff great fear, pain, stress, mental anguish, anxiety, emotional distress and alarm for which Plaintiff seeks monetary damages (compensatory and punitive) against Defendants, an award of costs and reasonable attorneys' fees, and such other and further relief as this Court may deem just and proper.

113. That to this day, Plaintiff suffers from fear, stress, anxiety, and severe emotional distress worried of further confrontations by Defendant **KIRSCHNER** and members of the **LCFD** and **NCPD** when he goes to work.

114. That the arrest, charges and criminal prosecution of Plaintiff before the charges were ACOD'd was the result of the complicit coverup and conspiracy engaged in and aided and abetted by the acts of the Defendants causing irreparable harm to Plaintiff.

115. It is clear that appropriate training and discipline of the individual **NCPD** and **LCFD** officers is also required as relief in this matter for their intentional, willfully negligent, malicious and reckless acts against Plaintiff civilian in the course of their duties.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Assault)**
**(Defendants KIRSCHNER and LCFD)**

116. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "115" of his Complaint with the same force and effect as if set forth at this point.

117. Defendant **KIRSCHNER** intentionally acted to place Plaintiff in apprehension of imminent harmful or offensive bodily contact, and Plaintiff suffered apprehension of imminent harmful or offensive bodily contact.

118. Defendant **KIRSCHNER** used his **LCFD** vehicle to trap Plaintiff while making threats to destroy and kill Plaintiff and spit on Plaintiff. Rather than investigating the actions of Defendant **KISRCHNER, DEPUTY CHIEF ADLER** instead used his position to influence the police and effect a proper investigation and charges.

119. Plaintiff sustained numerous injuries as a result of Defendant **KIRSCHNER**'s actions, including, but not limited to: being schemed against and then being arrested on false and improper charges, painfully handcuffed, and having to spend time in jail and the following months defending against such charges until they were all ultimately ACOD'd in court.

120. Plaintiff did not consent to any of Defendant **KIRSCHNER**'s actions.

121. As a result of Defendant **KIRSCHER**'s actions, committed while with his **LCFD** partner and driving the **LCFD** SUV # 3281 in his capacity as an SUV Plaintiff was injured and has suffered damages in an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

122. That Defendant **LCFD** is vicariously liable for the negligent, intentional, willfully negligent, reckless and malicious acts of its employees, firefighters and authorized agents including those named herein, Defendants **JOSHUA KIRSCHNER (LCFD),** and **DEPUTY CHIEF MEYER ADLER.**

123. Defendants **COUNTYOF NASSAU, NCPD, SHERIFFS DEPARMENT OF NASSAU** and **LCFD** as employer of the individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

124. By reason of the foregoing acts and omissions of the Defendants, acting in concert and aiding and abetting each other, Plaintiff suffered fear for his life, pain and suffering, extreme fear, mental anguish, distress, and anxiety, exposed him to disgrace, public humiliation and embarrassment, loss of his liberty and confinement all day and overnight for more than 24 hours, medical and legal costs and expenses, deprived of his constitutional rights and denied a reasonable religious accommodation and has been damaged in the sum of Two Million ($2,000,000.00) Dollars.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Battery)**
**(Defendants KIRSCHNER and LCFD)**

125. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "124" of his Complaint with the same force and effect as if set forh at this point.

126. Defendant **KIRSCHNER** intended to make bodily contact with Plaintiff, who suffered bodily contact which was harmful or offensive, or without Plaintiff's consent, including spitting on Plaintiff.

127. Plaintiff did not consent to any of Defendant's actions.

Accordingly, Defendants committed a battery upon Plaintiff and Defendant **LCFD** is vicariously liable for the acts of the individual **LCFD** firefighters, under the doctrine of *Respondeat Superior*.

128. By reason of the foregoing, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all Courts of lesser jurisdiction.

## AS AND FOR A THIRD CAUSE OF ACTION
## (False Arrest Under 42 U.S.C. § 1983 and New York State Law)
## (All Defendants Except John Doe #1,2)

129. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "128" of his Complaint with the same force and effect as if set forth at this point.

130. The above-mentioned acts and conduct committed by the Defendants constituted false arrest, without probable cause or justification and Defendants violated Plaintiffs' right under the Constitution and Laws of the State of New York.

131. Even worse, all Defendants (excluding John Doe #1 and John Doe #2) acted in concert to create a false story and narrative that was based on outright lies and misrepresentations in an effort to actually have Plaintiff arrested, face a felony charge, and protect Defendant KIRSCHNER.

132. Plaintiff was then actually taken into custody whereupon he was processed and charged with misdemeanor assault and felony criminal mischief, a D felony.

133. Plaintiff did not consent to the confinement he found himself in when he was taken to the 4th Precinct, and finger-printed and had his arrest photo taken.

134. Again, all Defendants failed to conduct a proper investigation and the warrantless arrest was not based upon probable cause, due to the failure of the Defendant Officers concocted false story with the individuals who gave statements. All such statements were from individuals either employed or affiliated with Defendants.

135. The individual Defendant **NCPD officers** failed to take into account, ignored, ommitted or misrepresented pertinent facts concerning Defendant **KIRSCHNER** following and attacking Plaintiff.

136. As a result, Plaintiff was arrested and taken into custody based upon the false paperwork collaborate effort of all Defendants (except **John Doe#1 and John Doe#2**) to create a false story and narrative.

137. Plaintiff sent the night in jail and had not eaten for over a day before he was arraigned, before a Judge, and then had to make several court appearances before his false criminal case was ACOD'd prior to bringing this action.

138. That as a result of the forgoing, Plaintiff was deprived of his liberty and was conscious of his imprisonment and Defendants **COUNTY OF NASSAU, NCPD, LCFD AND SHERIFF'S DEPARMENT** are vicariously liable for the acts of the individual Defendants, under the doctrine of *Respondeat Superior*.

139. That by reason of the foregoing, Plaintiff **MAKOWSKY** suffered serious economic and emotional damages in the sum of Two Million Dollars ($2,000,000.00).

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(False Imprisonment Under 42 U.S.C. § 1983 and New York State Law)**
**(All Defendants Except John Doe #1,2)**

140. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "139" of his Complaint with the same force and effect as if set forth at this point.

141. That the aforesaid actions of the individual defendants constitute false arrest and/or imprisonment of Plaintiff in violation of the Constitution and laws of Nassau County, the State of New York and the United States of America.

142. On or about February 7, 2023, all individual Defendants who swore to serve and protect the community, acted in concert to create a false story and narrative to have Plaintiff who was attacked, actually become the suspect to be the one arrested and charged, including a felony. Defendants **COUNTY OF NASSAU, NCPD, LCFD AND SHERIFF'S DEPARMENT** are vicariously liable for the acts of the

individual Defendants, under the doctrine of *Respondeat Superior*.

143. All Defendants actions, in concert and individually, constituted reckless, wrongful and malicious conduct without probable cause to physically detain Plaintiff and placed him under arrest.

144. That the aforesaid actions of the individual Defendants constitute false arrest and/or imprisonment of Plaintiff in violation of the Constitution and laws of Nassau County, the state of New York and the United States of America.

145. That as a result of the arrest, without probable cause, the Plaintiff was detained, finger-printed and processed prior to spending the next several months with a possible jail sentence hanging over his head.

146. That as a proximate result of the aforesaid acts, false fabrications of all Defendants in conjunction with all the omissions of the actual facts by the defendants, Plaintiff has suffered general, pecuniary and compensatory damages in the sum of Two Million Dollars ($2,000,000.00).

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Malicious Abuse of Process Under 42 U.S.C. § 1983 and New York State Law)**
**(All Defendants Except John Doe #1,2)**

147. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs “1” through “146” of his Complaint with the same force and effect as if set forth at this point.

148. Defendants issued criminal process against Plaintiff by causing his arrest and prosecution in a criminal court.

149. That the actions of the Defendants constituted false imprisonment and detention and violated Plaintiff’s rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, Fourth, Eighth, and Fourteenth Amendments thereto, and the Constitution of the State of New York.

150. That the conduct and actions of all the Defendants, all acting under color of State law, were done intentionally, maliciously, and/or with a reckless disregard for the natural and probable consequences of their acts, were done without lawful justification, and were designed to and did cause

specific pain and suffering in violation of the plaintiff's Constitutional rights as guaranteed under 42 U.S.C. §1983, the United States Constitution, Fourth and Fourteenth Amendments thereto, and the Constitution of the State of New York.

151. As a result of all the Defendants' impermissible conduct, and as a proximate result of the aforesaid acts and omissions by the Defendants, the Plaintiff has suffered general, pecuniary and compensatory damages.

152. That by reason of the forgoing, Plaintiff suffered serious economic and emotional injuries all to his damage in the sum of Two Million Dollars ($2,000,000.00).

153. As a consequence of the abuse of process detailed above, plaintiff sustained the damages hereinbefore alleged, and hereby make claims for punitive damages for the acts complained of herein.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Negligence)**
**(All Defendants)**

154. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "153" of his Complaint with the same force and effect as if set forth at this point.

155. That Defendants, through its agents, servants and/or employees, including, but not negligently performed their duties in that they failed to exercise such care in the performance of their police, fire department and sheriff department duties as reasonably prudent police officers, firefighters, and sheriff's officers would have under similar circumstances.

156. As a result of the negligence of Defendants, their agents, servants and/or employees, Plaintiff was caused to suffer personal injuries, violation of his constitutional rights, the emotional upset, shock, fear, and trauma of, among other things, being unlawfully arrested, searched, handcuffed, jailed, and subject to prosecution on a false charge. The arrest and prosecution prevented him from engaging in his customary work, and he was denied religious accommodation.

157. In sum, the arrest of Plaintiff and charges against him was without reasonable or probable cause and constituted a false arrest and charging of Plaintiff.

158. The incident as described above resulted from the negligence of the defendants, its agents, servants and/or employees, with no negligence on the part of the plaintiff contributing thereto.

159. The false arrest of Plaintiff by defendants, its agents, servants and/or employees, caused plaintiff pain, fear, suffering, humiliation, mental anguish and personal injury.

160. By reason of the foregoing, Plaintiff demands judgment against Defendants in a sum of money which exceeds the jurisdictional limits of all Courts of lesser jurisdiction.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Negligent Hiring, Training and Supervision)**
**(COUNTY OF NASSAU, NCPD, SHERIFF'S DEPARTMENT AND LCD)**

161. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "160" of his Complaint with the same force and effect as if set forth at this point.

162. That the actions of Defendants **COUNTY OF NASSAU, NCPD, SHERIFF'S DEPARTMENT AND LCD Defendants** through its agents, servants and/or employees, heretofore described constitute negligence in that Defendants negligently trained or failed to train its agents, servants and/or employees.

163. That the actions of Defendants through its agents, servants and/or employees, heretofore described constitute negligence in that Defendants negligently supervised or failed to supervise its agents, servants and/or employees.

164. That the actions of Defendants through its agents, servants and/or employees, heretofore

described constitute negligence in that Defendants negligently disciplined or failed to discipline its agents, servants and/or employees.

165. That the actions of Defendants through its agents, servants and/or employees, heretofore described constitute negligence in that Defendants negligently disciplined or failed to discipline its agents, servants and/or employees.

166. That Defendants were negligent in its retention of its agents, servants and/or employees, who Defendants knew or, in the course of adequate and proper investigation, should have reasonably known, were unfit to hold their positions in that they refused or failed to perform within the statutory and constitutional limits of authority and misused and abused their positions.

167. As a result of the negligence of Defendants Plaintiff was caused to suffer personal injuries, violation of his constitutional rights, the emotional upset, shock, fear, and trauma of, among other things, being unlawfully arrested, searched, handcuffed, jailed, and subject to prosecution on a false charge. The arrest and prosecution prevented him from engaging in his customary work and forced him to have to expend monies.

168. By reason of the foregoing, Plaintiff demands judgment against Defendants, in a sum of money which exceeds the jurisdictional limits of all the Courts of lesser jurisdiction.

**As and for an EIGHTH CAUSE OF ACTION**
**(Unlawful Search and Seizure Under U.S.C. § 1983 & NYS LAW)**

169. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "168" of his Complaint with the same force and effect as if set forth at this point.

170. Defendants subjected Plaintiff and his property to unreasonable searches and seizures without a valid warrant and without reasonable suspicion or probable cause do so.

171. Plaintiff was conscious and fully aware of the unreasonable searches and seizures To his person and property.

172. Plaintiff did not consent to the unreasonable searches and seizures to his person or property.

173. The unreasonable searches and seizures to Plaintiff's person and property were not

otherwise privileged.

174. Accordingly, Defendants violated Plaintiff's right to be free from unreasonable searches and seizures, pursuant to the Fourth Amendment to the United States Constitution.

175. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damagesherein before alleged.

176. Accordingly, Defendants violated Plaintiff's right to be free from unreasonable searches and seizures, pursuant to Article I, Section 12, of the New York State Constitution and Article II, Section 8, of the New York Civil Rights Law.

177. By reason of the foregoing, Plaintiff demands judgment against Defendants, in a sum of money which exceeds the jurisdictional limits of all the Courts of lesser jurisdiction.

**As and for a NINTH CAUSE OF ACTION**
**(Deprivation of Rights and Denial of Equal Protection of Laws under New York State law)**

178. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1" through "177" of his Complaint with the same force and effect as if set forth at this point.

179. Defendants discriminated against Plaintiff, a religious jew, on the basis of his race, national origin, ancestry, religion, and religious practice.

180. Defendants also engaged in the selective treatment of Plaintiff, in comparison to others similarly situated.

181. Defendants' discriminatory treatment of Plaintiff was based on impermissible considerations such as race, national origin, ancestry, religion, and religious practice with intent to inhibit or punish Plaintiff for the exertion of his Constitutional rights, or a malicious or bad faith intent to injure Plaintiff.

182. Defendants applied facially neutral laws against Plaintiff in a discriminatory manner.

183. Defendants, motivated by discriminatory animus, applied facially neutral statutes with adverse effects against Plaintiff.

184. Defendants did not possess a rational basis, excuse or justification for applying any laws or statutes against Plaintiff.

185. Accordingly, Defendants violated Plaintiff's rights, pursuant to Article I, Section 11, of theNew York State Constitution, Article VII, Section 79-N, of the New York Civil Rights Law and Section 296, Paragraph 13, of the New York Human Rights Law.

186. By reason of the foregoing, Plaintiff demands judgment against Defendants, in a sum of money which exceeds the jurisdictional limits of all the Courts of lesser jurisdiction.

**As and for a TENTH CAUSE OF ACTION**
**(Conspiracy to Interfere with Civil Rights and Failure to Prevent the Conspiracy under 42 U.S.C. §§ 1983, 1985 and 1986)**

187. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1" through "186" of his Complaint with the same force and effect as if set forth at this point.

188. Defendants engaged in a conspiracy against Plaintiff to deprive Plaintiff of his rights to engage in protected speech or activities, to be free from unreasonable searches and seizures, to beafforded a fair trial, to not be deprived of his liberty or property without due process of law, or ofthe privileges and immunities under the laws and constitutions of the United States and of the Stateof New York.

189. Defendants committed overt acts in furtherance of their conspiracy against Plaintiff.

190. As a result, Plaintiff sustained injuries to his person, was deprived of his liberty or was deprived of rights or privileges of citizens of the United States.

191. Defendants' conspiracy was motivated by a desire to deprive Plaintiff of his civil rights or because of some racial, religious, or otherwise class-based, invidious or discriminatory animus.

192. The Defendants that did not engage or participate in the conspiracy to interfere with Plaintiff's civil rights, had knowledge that acts in furtherance of the conspiracy were about to be committed or in process of being committed, possessed the power to prevent or aid in the prevention of the conspiratorial objective, and neglected to do so.

193. Accordingly, Defendants violated Plaintiff's rights, pursuant to the Fourth, Fifth, Sixth

and/orFourteenth Amendments to the United States Constitution.

194. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

195. By reason of the foregoing, Plaintiff demands judgment against Defendants, in a sum of money which exceeds the jurisdictional limits of all the Courts of lesser jurisdiction.

**As and for an ELEVENTH CAUSE OF ACTION**
**(Failure to Intervene UnderNew York State Law)**

196. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1" through "195" of his Complaint with the same force and effect as if set forth at this point.

197. Those Defendants that were present but did not actively participate in the aforementionedunlawful conduct, observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct, and failed to intervene.

198. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages herein before alleged.

199. By reason of the foregoing, Plaintiff demands judgment against Defendants, in a sum of money which exceeds the jurisdictional limits of all the Courts of lesser jurisdiction.

**As and as for a TWELFTH CAUSE OF ACTION**
**(Failure to Intervene Under 42 U.S.C. § 1983)**

200. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1" through "199" of his Complaint with the same force and effect as if set forth at this point.

201. Those Defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a dutyto intervene and prevent such conduct, and failed to intervene.

202. Accordingly, the Defendants who failed to intervene violated the Fourth and Fourteenth Amendments.

203. By reason of the foregoing, Plaintiff demands judgment against Defendants, in a sum of money which exceeds the jurisdictional limits of all the Courts of lesser jurisdiction.

**THIRTEENTH CAUSE OF ACTION**
**(Due Process/Fabrication of Evidence Claim Under 42 U.S.C. § 1983)**

204. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1" through "203" of his Complaint with the same force and effect as if set forth at this point.

205. The Defendants deliberately fabricated evidence against the Plaintiff and that as a resultof this evidence being used against him, he was deprived of his constitutional right without due process of law.

206. As a result, Plaintiff sustained injuries to his person, was deprived of his liberty or was deprived of rights or privileges of citizens of the United States.

207. The Defendants fabricated evidence in order to support their false arrest, detention and prosecution of the Plaintiff. The Defendants used this fabricated evidence and informed the prosecution that the fabricated evidence was true and accurate despite the fact that knew that the fabricated evidence was not true, As a result, the Plaintiff was deprived of his constitutional rights.

208. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

209. By reason of the foregoing, Plaintiff demands judgment against Defendants, in a sum of money which exceeds the jurisdictional limits of all the Courts of lesser jurisdiction.

**FOURTEENTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**

210. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1" through "209" of his Complaint with the same force and effect as if set forth at this point.

211. That the Defendants acting in the scope of their employment acted in a manner that exceeded all reasonable bounds of decency with an intent to inflict emotional distress upon the plaintiff.

212. That the plaintiff sustained emotional distress as a result of the defendants conduct.

213. By reason of the aforesaid, the Plaintiff has been damaged in a sum exceeding the jurisdictional limits of the lower courts.

**FIFTEENTH CAUSE OF ACTION**
**(Negligent Infliction of Emotional Distress)**

214. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs 1" through "213" of his Complaint with the same force and effect as if set forth at this point.

215. That the Defendants acting in the scope of their employment acted in a manner that exceeded all reasonable bounds of decency with an intent to inflict emotional distress upon the plaintiff.

216. That the plaintiff sustained emotional distress as a result of the defendants conduct.

217. By reason of the aforesaid, the Plaintiff has been damaged in a sum exceeding the jurisdictional limits of the lower courts.

**PUNITIVE DAMAGES**

218. Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "217" of his Complaint with the same force and effect as if set forth at this point.

219. By reason of the foregoing acts of Defendants, Plaintiff was the victim of the tortious conduct of the Defendants acting with deliberate indifference to Plaintiff's needs, and otherwise carelessly and improperly exercising their authority and power.

220. Such tortious conduct thereby committed by the Defendants was malicious, egregious and oppressive and characterized by malice or wantonness justifying the imposition of punitive damages.

221. The imposition of punitive damages on defendants, their agents, servants, officers and employees, is justified on the grounds that defendants, their agents, servants, officers, and employees, were malicious,

reckless or wanton, and should extend to their actions of false arrest, intentional infliction of emotional distress, abuse of process, civil rights violations and in retaining the employees who committed the torts after knowledge of the employee' proclivities to engage in such conduct.

## DEMAND FOR JURY TRIAL

A jury trial is demanded.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully demand and requests judgment against the Defendants as follows:

(1) On Plaintiffs' first, third, fourth and fifth cause of action, an award of compensatory damages, jointly and severally against the defendants, in an amount of no less than Two Million Dollars ($2,000,000.00);

(2) On Plaintiffs' second, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth,, thirteenth, fourteenth and fifteenth causes of action, an award of compensatory damages, jointly and severally against the defendants, in an amount exceeding the monetary jurisdictional limits of all lower courts which would otherwise have jurisdiction, to be determined by the jury.

(3) Punitive damages in an amount of no less than a proportional reasonable amount associated with damages in an amount no less Two Million Dollars ($2,000,000.00), and, for the wanton malicious, and intentional nature of Defendants conduct, to deter them from further such conduct; and

(4) Costs and disbursements of this Action, including attorney fees and costs, pursuant to 42 U.S.C. § 1988 andall applicable state or local laws; together with the costs and disbursements of this action.

(5) granting such other and further relief, including injunctive training relief directing training of officers as this Court shall deem just and proper.

Dated: New York, New York
February 5, 2024

Respectfully Submitted,

John C. Theodorellis, Esq.
*Attorney for Steven Makowsky*
John C. Theodorellis, PLLC
150 Motor Parkway, Suite 401
Hauppauge, New York 11788
(631) 787-8569
(631) 223-7734 (fax)
(718) 344-9494 (cell)
Dfndr88@aol.com

## ATTORNEY VERIFICATION

I, John C. Theodorellis, an attorney admitted to practice in the courts of New York State, state that my firm, **John C. Thedorellis, PLLC** is the attorneys of record for Plaintiff in the within action; I have read the foregoing and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief,and as to those matters I believe it to be true. The reason this verification is made by me and not by Plaintiff, is because Plaintiff resides outside the county where deponent maintains his office. I affirm that the foregoing statements are true, under the penalties of perjury.

Dated: New York, New York
February 5, 2024

John C. Theodorellis, Esq.
Attorney for Steven Makowsky
John C. Theodorellis, PLLC
150 Motor Parkway, Suite 401
Hauppauge, New York 11788
(631) 787-8569
(631) 223-7734 (fax)
(718) 344-9494 (cell)
Dfndr88@aol.com

Index No:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

STEVEN MAKOWSKY,

Plaintiff,

-against-

COUNTY OF NASSAU; NASSAU COUNTY POLICE DEPARTMENT; NASSAU COUNTY POLICE OFFICERS NICOLE BETTES, JOSEPH CHECCO, and CHRISTOPHER COSTELLO (individually and in their capacity as employees of the Nassau County Police Department); SHERIFF'S DEPARTMENT COUNTY OF NASSAU; JOHN DOES "1&2", (individually and in their capacity as employees of the Sheriff's Department County of Nassau); LAWRENCE-CEDARHURST FIRE DEPARTMENT, INC.; JOSHUA KIRSCHNER, (LCFD) AND DEPUTY CHIEF MEYER ADLER (LCFD) (individually and in their capacity as firefighters and employees of the Lawrence-Cedarhurst Fire Department),

Defendants.

---

**SUMMONS AND VERIFIED COMPLAINT**

---

John C. Theodorellis, PLLC
*ATTORNEY FOR PLAINTIFF*
*STEVEN MAKOWSKY.*
150 Motor Parkway, Suite 401
Hauppauge, New York 11788
(631) 787-8569

ATTORNEY CERTIFICATION: Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the Courts of the State of New York, certifies, to the best of his knowledge after reasonable inquiry, that the contentions contained in the annexed documents are not frivolous.

Dated: Hauppauge, New York
February 5, 2024

By: S/ John Theodorellis
JOHN C. THEODORELLIS, ESQ.
JOHN C. THEODORELLIS, PLLC
*Attorney for Plaintiff*

EXHIBIT A

REPORT ON THE INVESTIGATION INTO THE DEATH OF WALTER PEREZ

Report and Exhibits at https://ag.ny.gov/sites/default/files/oag_-_perez_english_1.23.pdf

New York State Office of the Attorney General

# Special Investigations and Prosecutions Unit

# Report on the Investigation into The Death of Walter Perez

Letitia James
NYS Attorney General

# EXECUTIVE SUMMARY

On July 8, 2015, Governor Andrew Cuomo signed Executive Order No. 147 (the "Executive Order"), appointing the Attorney General as the special prosecutor "to investigate, and if warranted, prosecute certain matters involving the death of an unarmed civilian . . . caused by a law enforcement officer." On Saturday, September 23, 2017, Walter Perez died following an interaction with members of the Nassau County Police Department ("NCPD"). Governor Cuomo subsequently issued Executive Order No. 147.12, which expressly conferred jurisdiction upon the Attorney General to investigate any potential unlawful acts or omissions by any law enforcement officers relating to Mr. Perez's death.

On September 23, 2017 at approximately 2:15 am, Mr. Perez's landlord called 911 and reported that Mr. Perez was intoxicated, banging on walls, and making a lot of noise. Earlier in the night, Mr. Perez's landlord and two tenants had observed Mr. Perez naked, dancing, and singing in a basement common area of the house. Four NCPD officers responded to Mr. Perez's home, and they observed that Mr. Perez was naked, bleeding from a swollen right eye, sweating profusely, and positioned in a fighting stance. The officers repeatedly told Mr. Perez to calm down, and an ambulance was called to provide medical assistance and transport Mr. Perez to a hospital for mental health evaluation.

After the officers had attempted to talk to Mr. Perez for approximately ten minutes, Mr. Perez told the officers that he had something for them. He then went into his bedroom and resumed his fighting stance. Officers entered into Mr. Perez's bedroom and determined that there were no weapons near Mr. Perez. They then attempted to handcuff Mr. Perez, and a struggle ensued, during which Mr. Perez attempted to punch one of the officers. That officer tasered Mr. Perez, using the dart-probe mode of the taser;[1] Mr. Perez ripped out one of the probes from his chest and pushed the officer into a closet. A second officer deployed her taser in dart-probe mode and, as a result, Mr. Perez fell to the floor. The first officer that initially deployed his taser in dart-probe mode then activated his taser again in drive-stun mode and tasered Mr. Perez multiple times as officers attempted to handcuff Mr. Perez. In total, two officers used their tasers a total of 13 times for a total of approximately 66 seconds.

A fifth officer arrived at the scene during the struggle. While on the ground, Mr. Perez continued to struggle and resisted officers' attempts to handcuff him for a few minutes. During the struggle, Mr. Perez bit the finger of one of the officers. After being handcuffed, Mr. Perez was placed face down on the floor. An Emergency Medical Technician (EMT) responding to the prior call from the officers arrived; the EMT observed that Mr. Perez went into cardiac arrest. Emergency life-saving measures, both at the scene and en route to a nearby hospital, were not effective, and Mr. Perez died at the hospital later that night.

---

[1] Tasers are used in "drive-stun" mode (where the instrument's two electrodes are pressed directly against the suspect) or "dart-probe" mode (where darts are released from the instrument, pierce the skin, and can cause temporary neuromuscular incapacitation, rendering an individual unable to move). When a Taser is deployed in dart-mode, and both darts remain embedded in the subject's skin, the officer can administer multiple five second electrical charges through the same darts by continuously depressing the trigger. Drive-stun mode delivers an electric shock that is a pain compliance technique, but does not cause override of an individual's central nervous system.

The New York City Medical Examiner found that the cause of Mr. Perez's death was "excited delirium[2] due to acute cocaine intoxication following physical exertion with restraint (i.e., handcuffs) and use of a conducted electrical weapon (i.e., a taser)." The Medical Examiner noted various injuries on Mr. Perez's body, including contusions to his upper outer forehead, left eye, right eyebrow, left cheek, nose, the right and left side of his neck, an abrasion to his upper outer forehead, a laceration to his right eyelid, and a fracture of the right superior horn of the thyroid cartilage with associated hemorrhage. Given that officers and civilian witnesses saw (prior to or at the time of the officers' arrival, respectively) significant injuries to Mr. Perez's face and head, it could not be determined whether Mr. Perez sustained these injuries before the police arrived or during the officers' struggle with Mr. Perez. The Office of the Attorney General ("OAG") retained an independent expert to review the Medical Examiner's work and conclusions. This independent expert also concluded that Mr. Perez's death was caused by excited delirium.

The investigation by the OAG also included, among other investigative steps: (1) review of Mr. Perez's medical records from the hospital where he was taken by the EMTs; (2) interviews of the landlord and three tenants who witnessed Mr. Perez's behavior before the police arrived and interacted with Mr. Perez (including review of cell phone video footage they recorded prior to the officers' arrival at the scene); (3) interviews of all responding NCPD Officers and the Emergency Medical Technician who treated Mr. Perez at the scene; and (4) interviews of the NCPD officer that oversaw the NCPD's taser course.

There is insufficient evidence to warrant any criminal charges in this matter. Under New York Mental Hygiene Law, Section 9.41, police officers may take into custody any person who appears to be mentally ill and is conducting himself in a manner that is likely to result in serious harm to himself or others. As reported by Mr. Perez's landlord in his 911 call, Mr. Perez was intoxicated and banging himself against walls. Earlier in the night, Mr. Perez had been dancing naked in a common area of the basement. When the officers arrived, they observed Mr. Perez

---

[2] Excited Delirium Syndrome (ExDS) is a medical condition that can manifest itself as a combination of anxiety, disorientation, elevated body temperature, psychomotor agitation, speech disturbances, unexpected physical strength, aggressive behavior, disorientation, hallucination, insensitivity to pain, and violent and bizarre behavior. It may result in sudden death, often through respiratory or cardiac arrest. *See* DC Mash, *Excited Delirium and Sudden Death: A Syndromal Disorder at the Extreme End of the Neuropsychiatric Continuum*, 7 FRONT. PHYSIOL. 435 (2016) (describing the effects of Excited Delirium). Excited delirium syndrome ("ExDS") is recognized by the New York State Division of Criminal Justice Services ("DCJS"), the National Association of Medical Examiners, and the American College of Emergency Physicians. U.S. DEP'T OF JUSTICE, NATIONAL INSTITUTE OF JUSTICE SPECIAL REPORT. STUDY OF DEATHS FOLLOWING ELECTRO- MUSCULAR DISRUPTION (2011), at https://www.ncjrs.gov/pdffiles1/nij/233432.pdf; AMERICAN COLLEGE OF EMERGENCY PHYSICIANS (ACEP), WHITE PAPER ON EXCITED DELIRIUM SYNDROME (September 2009), at http://www.fmhac.net/assets/documents/2012/presentations/krelsteinexciteddelirium.pdf. Further, the taser manufacturer for the tasers used by the NCPD issued a warning to law enforcement that conditions such as excited delirium, severe exhaustion, drug intoxication or chronic drug abuse may result in sudden death. TASER PROTECT LIFE, TASER HANDHELD CEW WARNING, INSTRUCTIONS AND INFORMATION: LAW ENFORCEMENT (May 19, 2017). However, ExDS is not listed in either (a) the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders or (b) the World Health Organization's International Classification of Diseases. Further, there is not a clear consensus on (or concerning, or about, but not "of") what the specific trigger of ExDS is or why some individuals suffering from ExDS ultimately die and others do not.

naked, bleeding from a swollen right eye, sweating profusely, and positioned in a fighting stance. This conduct justified officers taking Mr. Perez into custody pursuant to the Mental Hygiene Law.

Furthermore, pursuant to New York Penal Law Section 35.30(1), a police officer may: (1) "in the course of effecting or attempting to effect an arrest . . . of a person whom he or she reasonably believes to have committed an offense" (2) "use physical force . . . in self-defense or to defend a third person from what he or she reasonably believes to be the imminent use of physical force." As discussed more fully below, Mr. Perez (a) refused to be taken into custody; (b) repeatedly challenged the officers to fight and held a fighting stance; (c) attempted to punch an officer; and (e) bit an officer's hand. In response, the officers used verbal commands, their hands, the force of their bodies, and tasers to take Mr. Perez into custody.[3] Under these circumstances, the use of force was justified under Section 35.30(1).

This report is the fifth OAG report in the last three years of an investigation under the Executive Order addressing the use of force against a civilian who was displaying signs of a mental health and/or substance abuse crisis.[4] As law enforcement, academics and community advocates have noted, police responses to mental health and substance abuse crisis situations must be tailored to the situation at hand in order to prevent, to the extent possible, tragic outcomes.[5] The Nassau County Police Department has taken a significant step toward addressing that issue by becoming one of a growing number of agencies nationwide to begin training its members pursuant to the ICAT: Integrating Communications, Assessment, and Tactics, a training program providing officers with tools, skills, and options they need to successfully and safely defuse critical

---

[3] Section 35 sets forth a stricter standard for the use of lethal force. The use of a taser is considered to be non-lethal force. *See, e.g.*, *Buckley v. Haddock*, 292 Fed. Appx. 791, 796 (11th Cir. 2008); *Whitfield v. City of Newburgh*, 2015 WL 9275695, *11 (S.D.N.Y. Dec. 17, 2015); *People v. Patterson*, 115 A.D.3d 1174, 1175 (4th Dept. 2014) (use of a taser is "non-lethal force").

[4] *See* New York State Office of the Attorney General Special Investigations and Prosecutions Unit, Reports of Investigation into the Deaths of Joseph Seguin (August 2016), Richard Gonzalez (March 2017), Ariel Galarza (August 2017) and John Havener (August 2018).

[5] THE POLICE EXECUTIVE RESEARCH FORUM, CRITICAL ISSUES IN POLICING SERIES, GUIDING PRINCIPLES ON USE OF FORCE, at http://www.policeforum.org/assets/guidingprinciples1.pdf (2016); THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING: FINAL REPORT (2015), at http://elearning-courses.net/iacp/html/webinarResources/170926/FinalReport21stCenturyPolicing.pdf; INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, BUILDING SAFER COMMUNITIES: IMPROVING POLICE RESPONSE TO PERSON WITH MENTAL ILLNESS (2010), at http://www.theiacp.org/portals/0/pdfs/ImprovingPoliceResponsetoPersonsWithMentalIllnessSummit.pdf; DEPARTMENT OF JUSTICE, BUREAU OF JUSTICE ASSISTANCE, IMPROVING RESPONSES TO PEOPLE WITH MENTAL ILLNESSES, TAILORING LAW ENFORCEMENT INITIATIVES TO INDIVIDUAL JURISDICTIONS (2010), available at https://www.bja.gov/Publications/CSG_LE_Tailoring.pdf; Melissa Reuland et al., COUNCIL OF STATE GOV'TS JUSTICE CENTER, LAW ENFORCEMENT RESPONSES TO PEOPLE WITH MENTAL ILLNESSES: A GUIDE TO RESEARCH-INFORMED POLICE AND PRACTICE (2009), at https://www.csgjusticecenter.org/wp-content/uploads/2012/12/le-research.pdf; N.Y./N.Y.C. Mental Health-Criminal Justice Panel Report And Recommendations (2008), at http:// http://www.criminaljustice.ny.gov/pio/mh-cjreport.pdf; THE COUNCIL OF STATE GOV'TS CRIMINAL JUSTICE, MENTAL HEALTH CONSENSUS PROJECT (2002), available at https://www.ncjrs.gov/pdffiles1/nij/grants/197103.pdf.

incidents.[6] The NCPD officers plainly implemented ICAT principles and techniques during the initial portion of their interaction with Mr. Perez.

However, we urge the NCPD to critically evaluate whether additional efforts to minimize the stress during the latter portion of the incident could have been employed. Specifically, in considering the period after Mr. Perez entered his bedroom, was alone, was naked, and had no visible weapon in his hands or within his immediate reachable area, we encourage the NCPD to assess whether other techniques specifically taught in ICAT, such as continuing to monitor Mr. Perez while maintaining distance from him, were viable. Further, once the officers engaged physically with Mr. Lopez, the officers subjected him to more than three successful taser activations (both on dart-probe and drive-stun mode), which was inconsistent with NCPD's own policy.

Accordingly, we recommend that the NCPD:

- Continue to implement programs and review methods to defuse incidents involving individuals who appear to be experiencing excited delirium or a mental health crisis;
- Develop training programs cautioning NCPD officers concerning the simultaneous deployment of multiple tasers against the same civilian, as well as multiple uses of a single taser consecutively for a prolonged period;
- And finally, as we have recommended in prior reports concerning other police departments, the NCPD should work toward outfitting their officers with body-worn cameras and equipping tasers with cameras.[7]

## STATEMENT OF FACTS[8]

This incident can be divided into three segments: (1) the events leading up to law enforcement officers being called to Mr. Perez's apartment; (2) the interaction between the officers and Mr. Perez up to and including Mr. Perez being tasered; and (3) the response of law enforcement and medical personnel after Mr. Perez was tasered.

---

[6] ICAT was developed by the Police Executive Research Forum with input from hundreds of police professionals from across the United States. (https://www.policeforum.org/icat); the Nassau County Police Department has begun to implement the program throughout its agency (https://www.policeforum.org/icat-agencies.)

[7] New York State Office of the Attorney General Special Investigations and Prosecutions Unit, Reports of Investigation into the Deaths of Miguel Espinal (December 2016), Richard Gonzalez (March 2017), Edson Thevenin (December 2017) and Wardel Davis III (January 2018).

[8] None of the information referenced in this report was obtained through the use of grand jury subpoenas. Any subpoenas issued were pursuant to New York State Executive Law § 63(8).

### A. Events Preceding the Arrival of Law Enforcement

On the date of his encounter with NCPD officers, Mr. Perez had been living in the basement apartment of a multi-family house located at 230 Doughty Boulevard in Inwood, New York, for approximately nine years. Civilian witnesses J.G. and F.R. also lived in the basement apartment. J.G. and his wife rented an individual bedroom inside the basement next to Mr. Perez's bedroom, and F.R. rented an individual bedroom located at the opposite end of the basement. The basement bedrooms are connected by a common area, which includes the kitchen. The landlord lived on the first floor of the house.

On September 23, 2017, at approximately 1:00 am, J.G. and F.R. heard yelling in the common area of the basement. Both witnesses observed that Mr. Perez was naked, out of breath, talking to himself, and singing. Mr. Perez had taken all of his belongings and thrown them into the common area. F.R recorded Mr. Perez's behavior with his cell phone because of how strangely he was acting. J.G. called the landlord to address Mr. Perez's strange behavior. J.G. asked the landlord to come downstairs, because Mr. Perez was yelling and hitting the door to his own bedroom loudly and aggressively.

The landlord went downstairs and also observed Mr. Perez yelling, throwing things from his room, and sweating profusely. J.G., F.R., and the landlord believed Mr. Perez appeared drunk or under the influence of drugs. Mr. Perez was dancing and kept telling the landlord to "come on, come on" as if he wanted to fight. The landlord also recorded Mr. Perez's behavior on his cell phone. The landlord tried to reason with Mr. Perez for approximately 15-20 minutes. He asked Mr. Perez what was wrong, but Mr. Perez did not respond and instead kept singing and dancing naked around the common area. At some point, Mr. Perez calmed down and returned to his room. The landlord returned to his residence and J.G. returned to his room.

At approximately 2:00 am, J.G. called the landlord again, because Mr. Perez was banging on the doors and walls of his room. At 2:18 am, the landlord called 911 and reported that his tenant was making loud noises and appeared to be intoxicated. He then waited outside the house for the police to arrive.

### B. Law Enforcement Interaction with Mr. Perez

At approximately 2:24 am, NCPD dispatch sent a radio message to NCPD units to respond to a possible landlord-tenant dispute. The NCPD dispatch stated that the landlord made a noise complaint against his tenant: "[Complainant] states he rents a room in the basement to a male. He states the male may be intox and is making a lot of noise . . . banging and screaming in the basement. [Complainant] is afraid to go downstairs."[9]

At approximately 2:27 am, NCPD Officers Nicole Bettes, Jack Castronova, and Ray Moran arrived at the house where they were flagged down by the landlord, who was waiting outside. NCPD Officer Robert Sacco arrived as the other officers were still speaking with the landlord. The landlord said that this had never happened before; his tenant was extremely irate and wanted to fight the other tenants. The landlord escorted the officers downstairs into the basement. As the

[9] *See* NCPD Dispatcher Even Information Report dated September 23, 2017; Exhibit # 1.

officers made their way down the stairs, POs Moran and Bettes heard screaming and yelling coming from the basement. Once downstairs, the officers observed Mr. Perez in the kitchen/common area. He was naked, sweating profusely, bloody, and his right eye was swollen shut. The officers observed Mr. Perez standing on a door that had been torn off the hinges of Mr. Perez's bedroom. Mr. Perez became aggressive and started yelling at the officers. He then started to count the officers and told the officers "come on" and that he "had something for them." As he stated this, Mr. Perez was holding his hands up in a fighting stance.

At approximately 2:30 am, PO Sacco stepped outside and called for an ambulance because Mr. Perez was injured and seemed emotionally disturbed. The officers attempted to calm Mr. Perez down for approximately ten minutes; however, Mr. Perez did not calm down. Eventually, Mr. Perez stated, "I have something for you" and then went into his bedroom, which was dark. POs Moran, Sacco, Bettes, and Castronova followed Mr. Perez into his bedroom. Mr. Perez went into the back left corner of the room. The officers were fearful that Mr. Perez may have been attempting to retrieve a weapon. PO Castronova was able to find the light switch and turn on the bedroom light. The officers did not observe any weapons near Mr. Perez.

At that point POs Castronova and Moran tried to handcuff Mr. Perez, who pulled away and attempted to punch PO Moran. PO Moran then removed his taser from the holster. Mr. Perez started screaming and hitting his chest saying "come on." PO Moran then stated that he was going to taser Mr. Perez. At that moment, Mr. Perez lunged towards PO Moran. PO Moran deployed his taser, striking Mr. Perez in the chest and abdomen. The taser had virtually no effect on Mr. Perez; he continued to scream, removed one of the taser probes and again lunged towards PO Moran, pushing him into a closet. PO Bettes then deployed her taser, striking Mr. Perez in the chest and abdomen area. Once the taser dart-probes were embedded into Mr. Perez skin, PO Bettes activated her taser seven times. These multiple activations appeared to affect Mr. Perez because he stopped screaming and hitting his chest.

The officers took Mr. Perez down to the floor while he continued to struggle and kick his legs. The officers struggled with Mr. Perez for several minutes as they attempted to handcuff his ankles and wrists. Mr. Perez flailed his arms and continued to resist. PO Moran activated his taser in the drive-stun mode multiple times around Mr. Perez's legs and lower body in an effort to subdue him. PO Daniel Civorelli then arrived at the scene; he observed the officers struggling to restrain Mr. Perez and started assisting them in their efforts to handcuff Mr. Perez. The officers were finally able to apply handcuffs to Mr. Perez's wrists and ankles. After Mr. Perez was handcuffed, he defecated on the floor, spat at the officers, and continued to yell and curse at them. Mr. Perez was then placed face down while rear-cuffed.

Based upon an interview of PO Moran and the electronic data generated by his taser, PO Moran activated his taser in dart-probe mode once and drive-stun mode five times. The duration of each activation was approximately five seconds, for a total of approximately 30 seconds.[10] Based upon an interview of PO Bettes and the electronic data generated by her taser, PO Bettes activated her taser in dart-probe mode seven times and the duration of each activation ranged

[10] *See* AXON Taser Information Report dated February 16, 2018, for Taser Serial No. X13001W10 – issued to Officer Moran.

between four to six seconds, for a total of approximately 36 seconds.[11] Every taser application occurred before Mr. Perez was handcuffed.

### C. Response of Law Enforcement and Medical Personnel after Mr. Perez Was Tasered

At approximately 2:41 am, EMT Justin Angell arrived; he entered the bedroom and observed Mr. Perez lying face down and rear cuffed. At this point, POs Moran, Castronova, and Bettes were outside. POs Sacco and Civorelli had stayed with Mr. Perez and, according to their statements, they held Mr. Perez to control him as he was lying face down, but still moving. The officers requested a stretcher and spit mask from EMT Angell. POs Bettes and Castronova left the basement with EMT Angell to obtain the medical equipment and a stretcher from the ambulance. During this time, PO Civorelli noticed that Mr. Perez had calmed down. One of the police officers called for a supervisor and Sgt. Guadino responded at approximately 2:42 am.

After a few minutes, EMT Angell returned to the bedroom with the medical equipment and a stretcher. He asked the officers to place Mr. Perez on the stretcher. When Mr. Perez was placed on the stretcher, EMT Angell noticed that Mr. Perez was bluish in color and was not breathing. EMT Angell was unable to detect Mr. Perez's pulse. Mr. Perez was un-cuffed and CPR was administered by PO Bettes and EMT Angell. Prior to taking Mr. Perez to the ambulance, EMT Angell applied a heart monitor. While in the ambulance, POs Bettes and Civorelli continued to administer CPR. EMT Angell intubated Mr. Perez on the way to the hospital and administered epinephrine and Narcan©[12] . Mr. Perez did not regain a pulse and never started breathing again. Mr. Perez was pronounced deceased on arrival at St. John's Hospital at 3:25 am.

## MEDICAL EXAMINERS' DETERMINATIONS

Mr. Perez's body was examined by Dr. Declan McGuone of the Office of Chief Medical Examiner of the City of New York ("OCME") on September 23, 2017. Mr. Perez was 36 years old, 63 inches tall, and weighed 161 pounds.[13]

Dr. McGuone indicated three taser metallic probes penetrated the skin of Mr. Perez's anterior torso and were still attached at the time of his autopsy. Two taser probes penetrated Mr. Perez's upper left chest and one taser probe perforated his right upper abdomen and right lobe of the liver. There was one other, superficial puncture-type injury on Mr. Perez's torso that was consistent with the puncture injury caused by a taser probe.

---

[11] *See* AXON Taser Information Report dated February 16, 2018, for Taser Serial No. X13001RP9 - issued to Officer Bettes.

[12] Narcan© is the brand name of naloxone hydrochloride, which can prevent fatal opioid overdoses by displacing opioids from opiate receptors, thereby blocking their effects. Narcan has no effect on a person who has not consumed opioids; Cocaine is not an opioid. See, https://www.narcan.com/?gclid=EAIaIQobChMI9Kmfp9Dz2gIVjUsNCh1mWAQgEAAYASAAEgKGH_D_BwE

[13] The Medical Examiner's report is attached hereto as Exhibit #2.

Dr. McGuone noted that Mr. Perez had two contusions on the right side of the neck and a fracture of the right superior horn of the thyroid cartilage with associated hemorrhage. Samples of Mr. Perez's blood and bodily fluids were submitted for toxicological analysis, and revealed the presence of cocaine and benzoylecgonine (a metabolite of cocaine.)

The manner of death was deemed as "homicide."[14] The cause of death was noted as: "Excited delirium due to acute cocaine intoxication following physical exertion with restraint and use of conducted electrical weapon."

Dr. James Gill, an outside Medical Examiner retained by the OAG, reviewed the OCME report. Dr. Gill also classified the cause of death as: "excited delirium due to an acute cocaine intoxication." He further noted that "cocaine-induced excited delirium is a well-described entity and a competent explanation for sudden death with or without a physical altercation."

Dr. Gill further examined the OCME report and photographs for findings that might suggest that Mr. Perez's death could have been caused by manual strangulation or carotid restraint.[15] He found Mr. Perez's hyoid bone intact with no strap muscle hemorrhage. Those findings – along with the fact that the anterior and posterior muscles of the neck were free of hemorrhage, Mr. Perez's neck cervical vertebrae, laryngeal cartilages and paratracheal soft tissues were atraumatic, his upper airway was unobstructed, and his laryngeal mucosa and tongue were unremarkable – support the conclusion that Mr. Perez's death was not caused by intentional or incidental pressure to his airway or blood supply. Finally, Dr. Gill did not believe that the injury to Mr. Perez's neck caused his death, in light of the fact that Mr. Perez still appeared to be conscious after he was handcuffed.

## <u>LEGAL ANALYSIS</u>

There is insufficient evidence to warrant any criminal charges in this matter. Pursuant to Mental Hygiene Law Section 9.41, a police officer may take into custody any person who appears to be mentally ill and is conducting himself in a manner that may result in serious harm to himself or another person. Pursuant to New York Penal Law Section 35.30(1), a police officer may: (1) "in the course of effecting or attempting to effect an arrest . . . of a person whom he or she reasonably believes to have committed an offense" (2) "use physical force . . . in self-defense or to defend a third person from what he or she reasonably believes to be the imminent use of physical force."

At the time that NCPD officers responded to Mr. Perez's residence, the landlord had advised the officers that Mr. Perez was naked, banging on the walls, and acting aggressively toward

---

[14] The designation "homicide," as used by a Medical Examiner, means a death at the hands of another person or persons. In and of itself, the designation does not indicate or otherwise suggest criminality.

[15] Hlavaty L, Sung L. Strangulation and Its Role in Multiple Causes of Death. Am J Forensic Med Pathol. 2017 Dec, 38(4); p 283 – 288; Armstrong M, Strack GB. Recognition and Documentation of Strangulation Crimes: A Review, JAMA Otolaryngol Head Neck Surg. 2016 Sep 01; 142(9): 891 – 897; Strangulation a full spectrum of blunt neck trauma. Ann Otol Rhinl Laryingol, Nov 1985; p 542-546 and Strangulation: a review of ligature, manual and postural neck compression injuries, K.V. Iserson, Annotated Emergency Medicine, March 1984; p 179 - 185.

other tenants. The NCPD officers observed that Mr. Perez's bedroom door was broken off its hinges, Mr. Perez's personal belongings were strewn across the common area, and Mr. Perez was sweating profusely and bleeding from his face. In addition, officers observed that Mr. Perez's right eye was swollen shut. Mr. Perez's conduct was irrational and he was uncooperative, which led the officers to believe he was emotionally disturbed. As a result, an ambulance was called for assistance. Under these circumstances, the NCPD officers were authorized by New York Mental Hygiene Law to take Mr. Perez into custody and take him to a hospital for evaluation. *See generally Thomas v Culberg*, 741 F. Supp. 77, 81 (S.D.N.Y. 1990) (detention under the Mental Hygiene Law does not require proof that the person being detained presented an immediate danger to others); *People v. Yaniak*, 190 Misc.2d 84 (2001); *Higgins v City of Oneonta*, 208 A.D.2d 1067 (3d Dept 1994); *Matter of Carl C*, 126 A.D.2d 640, 640 (2d Dept. 1987).

Under Penal Law Section 35, the officers also were allowed to use force to restrain Mr. Perez given the conduct he engaged in while resisting the officers. The officers spent approximately ten minutes speaking to Mr. Perez and attempting to defuse the situation. They only used force after Mr. Perez ran into his bedroom and said, "I have something for you." A struggle ensued after Mr. Perez attempted to punch PO Moran. At the moment that Mr. Perez attempted to strike PO Moran with a closed fist and pushed Officer Moran into the bedroom closet, the NCPD Officers had probable cause to believe that Mr. Perez committed the offenses of Menacing in the Third Degree (Penal Law Section 120.15), Attempted Assault in the Third Degree (Penal Law Section 120.00), and Attempted Assault on a Police Officer (Penal Law Section 120.08).[16]

Accordingly, the force used to subdue Mr. Perez was objectively reasonable. *See generally Graham v. Connor*, 490 U.S. 386, 396 (1989) (relevant considerations in determining whether police use of force is reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."); *see also Johnson v. City of Lincoln Park*, 434 F. Supp.2d 467, 479-80 (E.D. Mich. 2006) (holding that the use of a taser was reasonable where a fourteen-year old, who was handcuffed and surrounded by four police officers, still violently resisted arrest); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding the use of a taser to "effectuate [an] arrest" was reasonable when the individual was "hostile, belligerent, and uncooperative"); *May v. Twp. of Bloomfield*, No. 11-14453, 2013 U.S. Dist. LEXIS 74437, 2013 WL 2319323, at *14 (E.D. Mich. 2013) (finding the uses of the taser were not excessive, as the decedent was then actively resisting arrest and fighting the officers, and was not then handcuffed or other restrained); *Turner v. City of Toledo*, 2012 U.S. Dist. LEXIS 66908, 2012 WL 1669836 (N.D. Ohio 2012) ("But even viewing the facts in the light most favorable to Plaintiff, it is undisputed that 'Mr. Turner attempted to pull his arms free from the grasp of the officers,' resulting

[16] Pursuant to New York Penal Law § 120.15, a person is guilty of Menacing in Third Degree when , by physical menace, he or she intentionally places or attempts to place another person in fear of death, imminent serious physical injury or physical injury. Penal Law § 120.15 (McKinney 2018). N.Y. Penal Law § 120.00 (McKinney 2018). a person is guilty of Assault in the Third Degree when with the intent to cause physical injury to another person, he causes such injury to such person or to a third person. N.Y. Penal Law § 120.00 (McKinney 2018).

in a 'physical struggle,' albeit one that was 'very brief [and] minor ....' [making] Lewis' use of the taser [ ] reasonable under Graham.").[17]

The number of times a taser is used and the duration of the taser applications are relevant to whether the use of force was reasonable. Officer Moran activated his taser in dart-probe mode once and drive-stun mode five times and the duration of each activation was approximately five seconds, for a total of approximately 30 seconds.[18] PO Bettes activated her taser in dart-probe mode seven times and the duration of each activation was between four to six seconds, for a total of approximately 36 seconds. [19] Courts have determined that multiple taser applications may be reasonable when necessary to subdue a subject. *See Marquez v. City of Phoenix*, 693 F.3d 1167 (9th Cir. 2012); *Sheffey v. City of Covington*, 564 Fed. Appx. 783 (6th Cir. 2012) (Officer's deployment of multiple tasers approximately 12 time in aggregate against a arrestee was reasonable because the subject continued to actively resist, struggle and bite officers); *Lee v. Metro. Gov't of Nashville/Davidson Co.* 432 Fed. Appx 436 (6th Cir. 2011) (police used a taser a total of nine times in both dart and stun mode on a man who refused to leave a concert and engaged in strange behavior); *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1168-76 (E.D. CA 2008) (holding that ten total taser applications – for a total of a maximum of 70 seconds – by three officers were not unreasonable due to the suspect's apparent physical threat to his wife, his continued resistance against officers, and the inability of multiple officers to physically subdue him); *Neal-Lomax.*, 574 F. Supp.2d at 1187-88 (holding that it was reasonable to taser the defendant seven times – for a total of 31 seconds – including five times after he was handcuffed, because he resisted an officer's attempts to place him in an ambulance). [20]

For the foregoing reasons, the evidence does not support criminal charges in connection with Mr. Perez's death.

---

[17] Courts have placed emphasis on whether, like here, officers warned a civilian that he or she would be tasered if the civilian did not stop certain conduct. *See Negron*, 976 F.Supp.2d at 367 (noting the importance of giving a warning before a taser is used); Neal-Lomax v. Las Vegas Metropolitan Police Dept., 574 F. Supp.2d 1170 (Dist. Ct. D Nevada 2008) (officers gave warnings).

[18] *See* AXON Taser Information Report dated February 16, 2018, for Taser Serial No. X13001W10 – issued to Officer Moran, Exhibit # 3.

[19] *See* AXON Taser Information Report dated February 16, 2018, for Taser Serial No. X13001RP9 - issued to Officer Bettes, Exhibit # 4.

[20] Courts have questioned simultaneous and multiple taser use in civil matters. *See, e.g.*, *Salgada v. City of Miami*, 85 F.Supp.3d at 1332 (refusing to grant qualified immunity for an officer that activated his taser multiple times after another officer had already successfully deployed her taser in probe deployment mode and the subject was in the process of being subdued). Unlike in *Salgada*, here, it was not clear that Mr. Perez was about to be subdued and, as noted above, in the section on the Medical Examiner, the appearance of only three probe marks on the decedent suggests that several of the taserings may not have taken effect. But, as discussed below, in the Policy Recommendations section, the officers should receive training in the effects of simultaneous and multiple taser applications.

## POLICY RECOMMENDATIONS

The OAG recommends that the NCPD:

- Continue to implement and review methods to defuse incidents involving individuals who appear to be experiencing excited delirium or a mental health crisis.
- Develop training programs cautioning NCPD officers concerning deployments of multiple tasers simultaneously against the same civilian and multiple use of one taser consecutively for a prolonged period.
- Outfitting NCPD officers with body-worn cameras and equipping tasers with cameras.

### A. Continued implementation and review of methods to defuse incidents involving individuals who appear to be experiencing excited delirium or a mental health crisis.

Initially, the OAG notes that the NCPD is among a growing number of law enforcement agencies nationwide that are implementing the ICAT: Integrating Communications, Assessment, and Tactics Program.[21] That program, developed by the Police Executive Research Forum with input from hundreds of police professionals from across the nation, is specifically designed to address situations involving unarmed individuals, or individuals armed with weapons other than firearms, who appear to be experiencing a mental health or other crisis.[22]

A guiding principle of ICAT is the Critical Decision Making (CDM) model which helps officers to gather information, assess threats, and weigh their options as they progress through incidents.[23] Where possible, not rushing, collecting more information, keeping a subject under observation while continuing communication, and tactically repositioning / containing the area are all expressly referenced and encouraged. Clearly, when the officers initially arrived on-scene, they recognized those principles and employed CDM techniques. For the first ten minutes of the incident, even though Mr. Perez had been engaged in belligerent behavior prior to the officers' arrival and was assuming a fighting posture relative to the officers, they did not physically engage with him. Instead, they simply tried to communicate with Mr. Perez and calm him down as they waited for the ambulance.

When Mr. Perez went to his room indicating that he wanted to "show [the officers] something," the officers appropriately took steps to ensure he did not have a weapon, in light of his belligerent, fighting behavior and words. The officers illuminated the room where he was and saw that Mr. Perez had no weapon; nor did the officers see any type of weapon in the area (in fact,

---

[21] *See*, https://www.policeforum.org/icat-agencies.

[22] *See*, https://www.policeforum.org/icat.

[23] *See*, *Id.* (Module II).

none of the information gleaned to that point gave any indication that Mr. Perez might be armed.) Under the circumstances, we encourage the NCPD to critically evaluate, employing the CDM, whether a better course of action at that point was to continue to monitor Mr. Perez, keeping space between him and the officers and using time to defuse his emotions, until the ambulance arrived - particularly since Mr. Perez was contained and visible to the officers. However, we are mindful that the OAG is reviewing the matter with "the 20/20 vision of hindsight" as opposed to the officers on scene, who must make "split-second judgments." *Graham*, 490 U.S. at 396-397.[24]

### B. Additional Training on Taser Deployment

Officers Moran and Bettes activated their tasers simultaneously, multiple times, and each consecutively for a period of approximately 66 seconds. This application of multiple tasers repeatedly for an extended period appears to have violated departmental policy.

NCPD Procedure OPS #12430 states that officers "will discharge no more than 3 *successful* applications of the ECD [Electronic Control Device/taser] on a single subject." The NCPD Procedure further states that "it is important to communicate the imminent use of the ECD to each other so that Members of the Force will not simultaneously discharge the ECD on a single subject."[25]

NCPD Procedure OPS # 12430 is consistent with guidelines issued by the DCJS Municipal Police Training Council ("MPTC"),[26] which state that generally, only one taser should be used on a civilian at a time. The MPTC guidelines further states that multiple taser applications cannot be justified solely because a suspect fails to comply with a command, absent other indications that a suspect is an immediate threat or about to flee from a serious crime. The guidelines recommend

---

[24] Moreover, The New York State Division of Criminal Justice Services' ("DCJS") Conducted Energy Device Course ("CEDC"), which NCPD has incorporated in its officer training, expressly addresses Excited Delirium as a condition that police officers may encounter and makes various recommendations as to how police officers should interact with individuals experiencing that condition. *See*, NEW YORK STATE DIVISION OF CRIMINAL JUSTICE SERVICES CONDUCTED ENERGY DEVICE COURSE (December 2009) (DCJS updated the CEDC in 2015, but the relevant sections relating to Excited Delirium remained the same); NEW YORK STATE DIVISION OF CRIMINAL JUSTICE SERVICES CONDUCTED ENERGY DEVICE COURSE, SECTION THREE CONDUCTED ENERGY DEVICE PRE-DEPLOYMENT, OBJECTIVE 7, PPT SLIDE 26 – 32 (Updated 2015).

The CEDC, like ICAT, instructs that when an officer encounters an individual displaying symptoms consistent with excited delirium, as was Mr. Lopez, and that person is not an *immediate* danger to himself, officers or others present, the officers should: create space and allow time for the individual to diffuse his or her agitation; ensure the scene is safe by removing any items in the immediate area of the subject that can be used as a weapon; appoint one individual as the contact officer; remain patient and give simple requests for compliance in a positive manner with offers to help and assist; avoid making continual eye contact with the individual as this may be seen as a threatening behavior; and encourage the individual to sit down as this generally has a calming effect. The CEDC further warns that using a taser in a drive-stun mode against a person experiencing symptoms of excited delirium will most likely increase that person's agitation.

[25] NASSAU COUNTY POLICE DEPARTMENT PROCEDURE OPS 12430 USE OF ELECTRONIC CONTROL DEVICE (ECD)/TASER (effective June 12, 2017), at 4. *See* Exhibit # 5.

[26] NEW YORK STATE DIVISION OF CRIMINAL JUSTICE SERVICES, MUNICIPAL POLICE TRAINING COUNCIL, RECOMMENDED GUIDELINES FOR THE USE OF CONDUCTED ENERGY DEVICES (December, 2009).

that if more than three (3) consecutive cycles are required, officers should reassess the situation and consider transitioning to another applicable force option. The most common factors that appear to be associated with fatal or other serious outcomes resulting from the use of a taser include: (1) repeated and multiple applications; (2) cycling times that exceed 15 seconds in duration, whether the time is consecutive or cumulative; and (3) simultaneous applications by more than one taser.[27] Data downloaded from Officer Bettes and Moran's tasers indicate that Officer Bettes activated her taser seven times, depressing the trigger for a period of 35 seconds, and Officer Moran activated his taser six times depressing the trigger for a period of 30 seconds. The officers also appear to have deployed their tasers simultaneously at times. For the reasons stated above (Legal Analysis), this conduct does not support criminal charges. Nevertheless, the NCPD should take whatever actions it deems necessary to address the officers' violation of OPS #12430, including significant additional training.

### C. Body-Worn Cameras and Tasers Equipped with Cameras

We have previously issued four reports recommending that police departments equip officers with body-worn and/or dashboard cameras.[28] Indisputably, videotaped evidence would have greatly facilitated the investigation of this case. We use the absence of body-worn cameras as an opportunity to recommend that NCPD work toward outfitting their officers with body-worn cameras, police vehicles equipped with dashboard cameras and tasers that are equipped with cameras.[29]

---

[27] MARYLAND ATTORNEY GENERAL, REPORT OF THE MARYLAND ATTORNEY GENERAL'S TASK FORCE ON ELECTRONIC WEAPONS (December 2009).

[28] We recommended that law enforcement agencies and policy makers work toward outfitting officers with body-worn and/or dashboard cameras in the following investigations: Wardel Davis (Buffalo PD), Miguel Espinal (NYPD), Richard Gonzalez (NYPD), and Edson Thevenin (Troy PD).

[29] On July 27, 2018, the OAG announced the creation of the CAMS (Capture an Account of a Material Situation) program, which will help equip local law-enforcement agencies in New York with body-worn cameras, available at https://ag.ny.gov/press-release/ag-underwood-announces-statewide-cams-program-equip-local-law-enforcement-officers. NCPD was qualified to participate in the program but opted not to submit an application.

# EXHIBIT B

NASSACU COUNTY POLICE DEPARTMENT Body-Worn Cameras OPS 6420

https://www.nassaucountyny.gov/DocumentCenter/View/34702/OPS-6420-Body-Worn-Cameras?bidId=

Nassau County Police Department

# Department Procedure

| PROCEDURE TITLE | PROCEDURE NUMBER | REVISION |
|---|---|---|
| **Body-Worn Cameras** | **OPS 6420** | **2** |

**POLICY**

The policy of the Police Department is to recognize the need to increasingly utilize audio-video technology to further the mission of the Department. The use of a Body-Worn Camera system will improve the Department's ability to objectively document law enforcement interaction with the public by providing recorded evidence of actions, conditions, and statements.

Members of the Force will activate the body-worn cameras (BWCs) **[See Definition]** when such use is appropriate to the proper performance of their official duties, where the recordings are consistent with this policy and law. This policy does not govern the use of surreptitious recording devices used in undercover operations.

**PURPOSE**

To establish procedures for the use, maintenance and control of the Department's BWCs.

This procedure will:

1) instruct Members of the Force on how and when to use BWCs so that they may reliably record their contacts with the public in accordance with the law,
2) enhance the Department's ability to review critical incidents and probable cause for arrest, to assist in gathering evidence, and to improve the accuracy of members' reports and testimony for investigative and prosecutorial purposes,
3) provide additional information for member evaluation and training,
4) offer the potential benefits of enhancing Department transparency, fostering accountability, encouraging lawful and respectful interactions between the public and the police, thereby increasing public trust.

**DEFINITIONS**

**Activation:** is the changing of the body-worn camera's status from standby mode **[See Definition]** to recording mode **[See Definition]**. Upon activation, the BWC will respond with an audible "recording" and a red light will continuously flash.

**Body-Worn Camera (BWC):** a Department-authorized camera worn on the member's person which captures both audio and video to document police activities.

**Body-Worn Camera Program Department Administrator (Department Administrator):** oversees the Body-Worn Camera Unit (BWC Unit) and has full access to and user rights within the BWC video management system. The administrator's responsibilities include, but are not limited to:

1) assigning and tracking BWC equipment,
2) coordinating with Information Technology Unit to control passwords and access rights,
3) coordinating with Information Technology Unit, Legal Bureau, and the Body-Worn Camera Unit regarding system-related issues,
4) coordinating maintenance and overseeing repairs,
5) ensuring proper procedures are followed in the uploading, review, and release of BWC video,
6) monitoring recordings, per Department policy and applicable law,
7) conducting audits and periodic quality control reviews to ensure video data has not been tampered with,
8) managing the retention schedule and status of BWC video,

9) continuous review of BWC policies and procedures and making recommendations for any necessary changes,
10) act as liaison with the BWC vendor.

**Bookmark:** is a timeline marker, inserted during recording, that serves to navigate to important events. When added to a recording, the bookmark notes the current date and time, and saves the still frame of that moment.

**Categorize:** is the act of assigning categories to define the type of recorded event or incident. Categories are searchable fields which allow for quickly finding specific BWC video footage. Categories may also have associated forms for capturing additional information specific to a given incident type.

**Command Administrator:** is a designated supervisor in each command responsible for:

1) maintaining the command's digital log,
2) designating a secure area within the Command for the storage of BWCs not being used,
3) sending BWCs for repair,
4) maintaining liaison with the Department Administrator.

**Covert Mode:** refers to the function of turning off all sound and indicator lights for the purpose of not overtly indicating that a recording is in progress. When exiting covert mode, the BWC will respond with an audible "covert off" and the status LEDS will power back on.

**Deactivation:** is the stopping of actively recording an incident and returning to standby mode. When deactivated, the BWC will respond with an audible "stop recording" and the flashing red light will go dark.

**Incident:** an encounter which requires some degree of law enforcement action or response. For the purposes of this procedure, an incident will have concluded when a member has cleared the scene and given a disposition, or has completed transport of a civilian or arrestee.

**Recording Mode:** upon activating the BWC and it sounding an audible "recording," the BWC will be in recording mode. A red light will continuously flash, and an audible beep will sound every 3 minutes as a reminder that a recording is in progress, except while in covert mode **[See Definition]**.

**Standby Mode:** refers to the BWC being powered on, but not actively recording. When the BWC is powered on, an audible "hello" will sound and a green LED will light to indicate the BWC is on.

**SCOPE**

All Members of the Force

**SOURCES**

Community Oriented Policing Services, US Department of Justice, and Police Executive Research Form, Implementing a Body-Worn Camera Program – Recommendations and Lessons Learned, 2014.

Department Administrative Order 21-033. (Body-Worn Camera-Desk Personnel)

Department Notification 21-180. (Body Worn Camera Placement)

Getac Wearable Gen3 Body Camera Training Manual, July 31, 2020, Rev: V1.0

International Association of Chiefs of Police, Body-Worn Cameras, April, 2019.

Municipal Police Training Council, Body-Worn Camera Model Policy, September, 2015.

Police Department City of New York Patrol Guide, Use of Body-Worn Cameras, August, 2020.

**RULES**

1. Members of the Force will use BWCs in accordance with Department policies and state laws.
2. All BWC equipment and all data, images, video and metadata captured, recorded, or otherwise produced by the equipment, is for official use only and remains the sole property of the Department.
3. Only trained, assigned, and authorized personnel will be required to use BWCs during their assignments.
4. Members will only use BWCs approved and issued by the Department while on duty. No non-Departmental BWC equipment (i.e., personal) or other recording devices will be used.
5. Members will only use BWCs assigned to them. Members will not use a BWC assigned to another member, or not previously assigned to them, without authorization from a supervisor.
6. BWCs are for official use only and will not be utilized for personal reasons or non-work related activities.
7. Members will not erase, reuse, modify, copy, publish, share or tamper with any recording. Only authorized system administrators may manage previously recorded digital recordings in accordance with Departmental policies and state laws.
8. BWC recordings will not be disseminated, copied, or released in any manner outside of the Department without the approval of the Commissioner of Police or his/her designee.
9. Members will not use other electronic devices or other means to intentionally interfere with the capability of the BWC equipment.
10. Members will not intentionally activate BWCs:
    a. to document any deaths for crime scene purposes, unless directed by a supervisor,
    b. when discussing tactical planning and strategies,
    c. during Departmental meetings or training,
    d. to record the performance of administrative duties and non-enforcement functions,
    e. to record routine activities within Department facilities,
    f. where a reasonable expectation of privacy exists, such as dressing rooms, locker rooms or restrooms, unless the member is present in an official capacity,
    g. to capture discussions between individuals with privilege, such as attorneys, members of the clergy, peer support counselors, and medical professionals.
11. Unless a legitimate law enforcement interest/event has such evidentiary value that outweighs an individual's privacy, members will ***not*** activate BWCs:

a. to record confidential informants or undercover officers,
b. to record victims of sex crimes,
c. during a strip or body cavity search,
d. when an individual is nude or when sensitive human areas are exposed,
e. during non-law enforcement encounters while inside medical and psychiatric facilities, or safe centers,
f. when present in a court facility, except for the immediate lodging of a prisoner,
g. when a potential witness requests to speak to a member confidentially or desires anonymity,
h. when a victim or witness requests that he/she not be recorded and the situation is not confrontational,
i. when a victim requests that he/she not be recorded as a condition of cooperation and the interests of justice require such cooperation.

12. Members will not allow the public to review BWC recordings, unless permission has been obtained from the Commissioner of Police or his/her designee.

13. BWCs will be deactivated immediately prior to entering a police facility, except in the case of an arrest. When accompanying a prisoner into a police facility, members will continue recording until the prisoner has been lodged for arrest processing.

14. Members will wear the BWC vertically on the outermost garment and will not cover the lens with any external items i.e. sunglasses or surgical masks.

**REPLACES**

OPS 6420, revision 1, dated 9/9/2021

**PROCEDURE**

**A. Signing On/Equipment Check**

**Note:** Members assigned to utilize a BWC must use this equipment in accordance with Department policies and state laws. Members are responsible for and will use reasonable care to ensure proper functioning of Department-issued BWCs.

**Note:** While BWCs are useful for documentation purposes, these do ***not*** take the place of primary evidence collection, documentation procedures, and written reports.

**Member of the Force**

1. At the beginning of each tour,

a. *inspects* the BWC to ensure the equipment is fully charged and operating properly,

**Note:** There are features on the BWC which enable the member to determine, before each tour, if the BWC is operating properly. When powering on the BWC, the left LED will light up green and the BWC will respond with an audible "hello".

b. if there is any equipment malfunction or concerns related to battery life and depletion,

(1) *attaches* the BWC to the external battery, ***and***

(2) *re-tests* the BWC again to ensure proper function,

c. if the BWC continues to malfunction,

(1) *immediately notifies* a supervisor and *specifies* the problem,
(2) *notes* the problem in their memo book,

**Note:** A supervisor will immediately arrange to replace a non-functional BWC. Members will not use a BWC assigned to another member, or BWC not previously assigned to them, without authorization from a supervisor.

d. *securely attaches* all supplied components of the BWC to the outermost garment, either center mass or slightly off center mass, ***not horizontally***, to provide the lens a clear view to capture quality video and audio data and *ensures* the BWC is properly positioned to clearly record police activities regardless of uniform attire,

e. *confirms* the BWC is in standby mode **[See Definition]** prior to the beginning of the tour.

**Supervisor**

2. *Ensures* officers under his/her command are equipped with properly functioning BWCs and that the BWCs are utilized:

a. as directed by the respective manufacturer's instructions/ per training guidelines, ***and***

b. in accordance with Department policy and procedures.

3. If notified of a malfunctioning BWC and the problem could not be resolved, *notifies* the Desk Supervisor/Desk Officer.

**Desk Supervisor/ Desk Officer**

4. If notified of a malfunctioning BWC,

a. *assigns* a spare BWC to the officer,

**Note:** Only a desk supervisor/desk officer has the authority to assign a spare BWC.

b. *records* the newly assigned BWC in ***both*** the command's digital log and the GETAC/EVM dashboard portal,

c. *notifies via email* ***both*** the Command Administrator **[See Definition]** and the Body-Worn Camera Program Department Administrator (Department Administrator) **[See Definition]** of the newly assigned BWC,

d. *forwards* BWC to be repaired to the Command Administrator.

**Command Administrator**

5. *Arranges* for BWC repairs, notifying the Department Administrator via email of:

a. any new equipment malfunctions,

b. missing or damaged BWCs.

**Note:** The Supervisor and/or Department Administrator will initiate an investigation when notified of a missing or damaged BWC.

**B. Activating and Using the BWC**

**Note:** A member who fails to activate **[See Definition]** his/her BWC for any incident **[See Definition]** according to Department policies and rules, whether intentionally or

unintentionally, will report the failure to record to his/her supervisor as soon as practical.

**Note:** If an on-duty member is going out on a line of duty injury/illness, a Patrol Supervisor should ensure the member's BWC is uploaded.

**Member of the Force**

1. *Activates* the BWC, ***prior*** to making contact, in any of the following incidents, unless it is unsafe or impractical to do so:

**Note:** Upon activation, the BWC will be in recording mode **[See Definition]**. The BWC will respond with an audible "recording" and a red light will continuously flash while recording.

a. all calls for service,
b. self-initiated activities, including:

(1) VTL stops,
(2) vehicle pursuits,
(3) field stops,
(4) or any other investigative or enforcement encounters,

**Note:** Members will activate the BWC ***prior to initiating*** any of the above listed self-initiated activities.

c. requests for consent to search without a warrant, including searches of persons, buildings, or vehicles,

**Note:** When practical, bookmark **[See Definition]** the request for consent and the consent for the incidents specified above.

d. seizure of evidence,
e. advisement of Miranda rights, when required,
f. statements made by individuals (subjects and witness) in the course of an investigation or complaint,
g. civilian and arrestee transports,
h. any other contact that becomes adversarial after the initial contact in a situation that would not otherwise require recording.

**Note:** Desk personnel will activate BWC for any incident which requires some degree of law enforcement action or response, which includes,

1. domestic exchanges,
2. a subject's surrendering for an arrest,
3. individuals who appear to be agitated or antagonistic,
4. individuals experiencing an altered mental status.

2. *Notifies* members of the public that the interaction is being recorded as soon as reasonably practical, unless such notification could compromise safety or impede an investigation.

**Note:** Suggested notification: "Sir/Ma'am, I am XXXX of the Nassau County Police Department. This encounter is being recorded".

**Note:** During incidents involving traffic stops or field stops, members will also inform the individual of the reason for the stop as soon as practical.

**Note:** A person's consent is not required to start or continue recording.

**Member of the Force**

3. *Considers* bookmarking key or important events as necessary.

4. Once the BWC has been activated, *continues recording* until the event that prompted the activation has concluded, ***except*** in situations in which continued recording:

   a. may jeopardize or otherwise compromise the safety of the member(s) or the public,

**Note:** For example, when at the scene of a bomb, suspected bomb, or suspicious package, members will refrain from using electronic devices, including BWCs, radios, mobile data terminals (MDTs) and cell phones, when within 300 feet of a suspected bomb location. **[See OPS 12111, Bomb and Bomb Threats]**

   b. hinders the ability to conduct a proper investigation,
   c. seriously compromises an individual's privacy and dignity and that compromise significantly outweighs any legitimate law enforcement interest. Such situations might involve recording in:

      (1) hospitals or clinical settings when no crime has been committed,
      (2) houses of worship,
      (3) shelters,
      (4) government offices.

**Note:** Members will continue to record or reactivate recording ***regardless of the location***, whenever the evidentiary value of the recording outweighs a right to privacy and/or dignity. For example, if during the transport of a mental aided person a recording has been deactivated due to entering a hospital, member will reactivate recording if the mental aided person becomes confrontational.

**Note:** Members are not obligated to initiate or cease recording an incident solely at the request of the individual with whom the member is interacting. Consideration may be given to recording only audio.

**Note:** Members may also consider switching the BWC to covert mode **[See Definition]**, which turns off all sounds and covers indicator lights for the purpose of not overtly indicating that a recording is in progress.

5. ***Will not*** use BWC video for confirmatory identifications (show-ups).

**Note:** Show-ups must be done in person, and not by a witness viewing a BWC video of the suspect.

6. *May deactivate* **[See Definition]** the BWC during an incident if:

   a. the member is no longer actively engaged in the investigation or interacting with a member of the public,

   **Note:** For example, holding a traffic post at an auto accident

scene.

b. the incident is a ***routine*** aided case and doing so will protect the aided person's dignity,

**Note:** For example, routine sick at home, high blood pressure, assist invalid.

**Member of the Force**

7. *Deactivates recording* upon completion of the incident.

8. *Categorizes* **[See Definition]** the recording.

9. *Indicates* on any reports prepared, the existence of BWC footage.

**Note:** For example, case reports, use of force reports, arrest reports, etc.

10. If the incident will be a squad case, *notifies* the Detective Squad of the existence of BWC footage where the subject has asked for an attorney.

11. If, during the course of the tour, the BWC malfunctions or if the BWC was unintentionally activated and a prohibited recording occurred,

 a. reports to a supervisor immediately,
 b. proceeds per supervisor's instructions,
 c. makes a memo book entry.

**Note:** If the BWC was unintentionally activated but the recording is not prohibitive and is of no evidentiary value, the member is ***not*** required to notify a supervisor. The member must, however, make a memo book entry documenting the unintentional recording.

12. *Makes* a memo book entry regarding the BWC in the following circumstances:

 a. if assigned to a call but given a disregard by the other responding unit prior to arrival,
 b. if assigned to a call and a recording is made,
 c. if not assigned to a call but responds as backup and a recording is made.

**Note:** If assigned to a call but given a disregard by another unit ***and*** CB exchanges the call to that unit, no memo book entry is necessary.

13. If the BWC ***was not*** activated during a required activation law enforcement event, ***notifies*** a supervisor as soon as practical.

**Supervisor**

14. If notified by a member of a failure to activate the BWC as required,

 a. *reviews* the incident,
 b. *makes entry* in PDCN Form 256, Failure to Activate BWC Log,

 **Note:** Each command will download from the department intranet, and maintain, a PDCN Form 256, Failure to Activate BWC Log Excel Spreadsheet, exclusive to their command.

 c. *notifies* Commanding Officer for review.

15. If at scene, *determines* if immediate upload of BWC footage is

necessary and *directs* the officer accordingly.

**Supervisor**

16. If at the scene of a shooting or other serious incident in which officers were involved, *ensures* an Administrative Officer from the Deadly Force Response Team [See OPS 12460] collects and secures all BWCs from those officers involved in the incident.

**Member of the Force**

17. *Responds* to station house or other designated location to upload stored recordings from previous or current tour, ***at some point during each tour, whenever practical, or*** as directed by a superior officer.

18. At the end of the tour,

    a. *powers* off the BWC,

    **Note:** The BWC will respond with an audible "goodbye".

    b. *charges* the BWC.

**C. Data Storage, Security and Retention**

**Note:** BWC recordings are considered official investigative materials and, as such, will be handled in accordance with existing Department policy and applicable laws.

**Department Administrator/ BWC Unit**

1. *Follows* instructions for data storage and preservation methods in accordance with specific manufacturer's guidelines and recommendations.

2. *Ensures* all BWC recordings will be accessed only:

    a. by Department-approved system users,
    b. on Department-approved equipment, ***and***
    c. for viewing and copying for official purposes only.

3. *Logs into* BWC video management system and identifies BWC video recordings that have not been categorized properly.

**Note:** Each video will be categorized (by the uploading member) to allow for efficient management storage and retrieval of files.

4. If a recording has not been properly categorized, *contacts* the Command Administrator and *requests* that he/she directs the uploading member to properly categorize the BWC recording.

5. *Complies* with retention schedules as dictated by applicable law.

**Note:** If a BWC recording has evidentiary value in an ongoing investigation, court proceeding or appeals process, the recording will be retained through the pendency of the case or in accordance with applicable law, whichever is greater. Supervisors and investigators may request, through channels, that a BWC recording be retained beyond the prescribed retention period, if necessary.

**Note:** Non-evidentiary data will be retained for a minimum of six (6) months.

6. If no extension of video data retention is required, manages the recording(s) in accordance with Department retention procedures and with the approval of the Department Administrator.

7. If a recording is deemed to be useful as a training tool, *retains*

the recording for as long as practical.

**D. Arrest Processing and Sharing of BWC Videos**

**Arresting Officer/ Assigned Officer**

1. *Assures* all BWC recordings are properly categorized.
2. If the case involves an arrest, *identifies* all BWC videos associated with the arrest an if known, any other pertinent BWC video from previous incidents that can enhance the arrest case.

**Note:** When the arresting/assigned officer and/or /BWC Unit become aware of any pertinent BWC video that is associated with their arrest case (e.g., BWC video containing suspect information, complainant/victim/witness statements, or are of any investigative value in regard to the establishment of probable cause, etc.), regardless of when the video was recorded, will ensure that those BWC video files are properly identified.

**BWC Unit**

3. *Shares* BWC video as follows:
   a. with Legal Bureau when a member of the Department becomes aware of potential or actual civil litigation involving a matter captured by a BWC, ***and/or***
   b. with assigned detective/investigator when any portion of an incident under investigation is captured by a BWC.

**E. Accessing and Viewing Footage**

**Police Officer/ Detective**

1. *May review* his/her own BWC recording, or the BWC recordings made by other (uniformed) members of the Department for a given incident, for official purposes, including:
   a. conducting a criminal investigation,
   b. preparing for courtroom testimony or courtroom presentation,
   c. providing testimony pursuant to an administrative inquiry,
   d. reviewing an incident prior to writing a routine report,
   e. training and professional development,
   f. preparing for civil litigation.

**Note:** In routine cases, the viewing will be utilized as a tool when completing written reports to ensure the accuracy and consistency of events. In officer-involved shootings, use of force cases, or when a (uniformed) member of the Department is the subject of an official Department investigation or is a witness in an official Department investigation, access to recordings may be delayed. However, officers will be permitted to review recordings at a time allowed by the supervisor in charge of the investigation prior to making a statement or report.

**Supervisor**

2. In addition to the permitted access listed in Step 1 (above), *may review* BWC recordings of members of his/her command for the purpose of ensuring compliance with the BWC policy and procedure, including:
   a. administrative inquires,
   b. civil claims,

c. reports of misconduct,
d. meritorious conduct, ***and***
e. if it is deemed valuable as a training tool.

**BWC Unit**

3. For requests to view BWC recordings originating from ***outside the Department***, *releases* of BWC recordings in accordance with the Department's established procedures. As such, BWC recordings will:

   a. be subject to the same security restrictions and chain of evidence safeguards as detailed in the Department's evidence control and records confidentiality policies,
   b. not be released to anyone other than bona fide criminal justice agencies or prosecutor's office without prior approval of the Commissioner of Police or his/her designee,
   c. be otherwise subject to the procedures required by the Freedom of Information Act and subject to the same statutory exemptions from disclosure as any other Departmental records.

4. For requests to view BWC recordings originating from outside the Department that have been denied for any reason, *specifies and documents* reasons for the denial.

**F. BWC Recordings Used For Training and Administrative Purposes**

**Patrol Supervisor/ Supervisor, BWC Unit/ Training Sergeant**

1. *Periodically review* BWC video as appropriate to:

   a. provide feedback,
   b. assess overall officer performance and compliance with procedures,
   c. take necessary remedial action to address and correct any performance or tactical deficiencies observed,
   d. determine if BWC video may be useful for training purposes.

**Note:** Commanding Officer, Police Academy or his/her designee will notify member when member is a participant in a video to be used for training purposes.

2. When made aware than an officer made a prohibited recording, ***or*** if an officer failed to record or interrupted the recording of a legitimate law enforcement interest,

   a. *reviews* all necessary documentation,
   b. *makes a determination* regarding the circumstances surrounding the infraction,
   c. *documents* findings,
   d. *forwards* findings (TOC) and recommends remedial action, if necessary.

EXHIBIT C

LCFD FACEBOOK PAGES

20+

Give!

20

EXTRICATION, MVA - VEHICLE INTO BUILDING at 312 WASHINGTON AVE, Cedarhurst c/s: COURT AVE and 5TH AVE . . 04:52:49

To ring in the new year, On Monda... See more

1

**Lawrence-Cedarhurst Fire Department**
January 2 ·

On Sunday, December 31st, 2023 the @lawrencecedarhurstfiredept held its annual swearing in ceremony for the new executive staff.

Sworn in from right to left: Deputy Chief Meyer Adler (3201), Chief of Department Michael T. Beilinson (3200), Deputy Chief Joseph McHugh (3202), Commissioner Joshua Kirschner.

We wish them the best of luck as they lead us into 2024. ... See more

20+




Michael Fragin and 51 others 7 comments

Like Comment Share

View more comments

Joseph Norman
Gentlemen So Proud of You All... Good Luck 🍀 Gods Speed 🙏🗽🇺🇸

4w Like Reply

Write a comment...

Lawrence-Cedarhurst Fire Department
December 24, 2023 ·

**Supreme Court State of New York, County of Nassau**

Steven Makowsky
Plaintiff(s),

vs.

County of Nassau, et al
Defendant(s).

Index Number: 602091/2024
Filed On: 02/05/2024
Court Date:

AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau ss:

I, Muriel Schultz, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York. That on 3/26/2024 at 11:09 AM at One West Street, Mineola, NY 11501, deponent served the within Notice of Electronic Filing, Summons and Verified Complaint bearing Index # 602091/2024 on County of Nassau Defendant therein named (the intended recipient).

COUNTY AGENCY: A County Agency by delivering a true copy of each to Judith Urso personally; deponent knew said County Agency so served to be the County Agency described as the named Defendant and knew said individual to be the Clerk thereof an authorized person to accept service of process.

DESCRIPTION: Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows:

Gender: Female Race/Skin: White Age: 51 - 65 Yrs. Weight: 131-160 Lbs. Height: 5ft 4in - 5ft 8in Hair: Brown Glasses: Yes Other:

COMMENTS:

X [signature]
Muriel Schultz

Subscribed and sworn to before me, a notary public, on this 26 day of March, 2024.

[signature]
Notary Public

Job # 285113

Client Reference: John C. Theodorellis 1 of 9

*TMS Services Inc, 977 N. Broadway, Massapequa, NY 11758 License: 2112432-DCA*

NANCY MANZELLA
Notary PUBLIC: State of New York
No.01MA6083790
Qualified in Suffolk County
Commission Expires 11/25/26

**Supreme Court State of New York, County of Nassau**

Steven Makowsky

Plaintiff(s),

vs.

County of Nassau, et al

Defendant(s).

Index Number: 602091/2024
Filed On: 02/05/2024
Court Date:

AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau ss:

I, Muriel Schultz, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York. That on 3/26/2024 at 11:27 AM at 1490 Franklin Avenue, Mineola, NY 11501, deponent served the within Notice of Electronic Filing, Summons and Verified Complaint bearing Index # 602091/2024 on Nassau County Police Department Defendant therein named (the intended recipient).

COUNTY AGENCY: A County Agency by delivering a true copy of each to PSA Eilenberg Shield# 223 personally; deponent knew said County Agency so served to be the County Agency described as the named Defendant and knew said individual to be the Authorized Agent thereof an authorized person to accept service of process.

DESCRIPTION: Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows:

Gender: Female Race/Skin: White Age: 36 - 50 Yrs. Weight: Over 200 Lbs. Height: 5ft 4in - 5ft 8in Hair: Brown Glasses: No Other:

COMMENTS:

x Muriel Schultz
Muriel Schultz

Subscribed and sworn to before me, a notary public, on this 26 day of March, 2024.

Notary Public

Job # 285121

Client Reference: John C. Theodorellis 2 of 9

*TMS Services Inc, 977 N. Broadway, Massapequa, NY 11758 License: 2112432-DCA*

NANCY MANZELLA
Notary PUBLIC: State of New York
No.01MA6083790
Qualified in Suffolk County
Commission Expires 11/25/26

Supreme Court State of New York County of Nassau

Steven Makowsky
Plaintiff(s),

vs.

County of Nassau, et al
Defendant(s).

Index Number: 602091/2024
Filed On: 02/05/2024
Court Date:

AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau ss:

I, Muriel Schultz, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York. That on 3/26/2024 at 11:27 AM at 1490 Franklin Avenue, Mineola, NY 11501, deponent served the within Notice of Electronic Filing, Summons and Verified Complaint bearing Index # 602091/2024 on Nassau County Police Officer Nicole Bettes Defendant therein named (the intended recipient).

SUITABLE AGE PERSON: By delivering a true copy of each to PSA Eilenberg Shield# 223, Co-Worker / Authorized a person of suitable age and discretion. That person was also asked by deponent whether said premises was the Defendant's Business within the state and the reply was affirmative.

On 3/26/2024 Deponent also enclosed a copy of same in a postpaid sealed wrapper properly addressed to Defendant at Defendant's Business at 1490 Franklin Avenue, Mineola, NY 11501 by First Class Mail marked Personal & Confidential and deposited said wrapper in (a post office) official depository under exclusive care and custody of the United States Postal Service within New York State.

DESCRIPTION: Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows:

Gender: Female Race/Skin: White Age: 36 - 50 Yrs. Weight: Over 200 Lbs. Height: 5ft 4in - 5ft 8in Hair: Brown Glasses: No Other:

COMMENTS:

MILITARY SERVICE: I Asked the Person Spoken to whether defendant was in active military service of the United States or of the State of New York in any capacity whatever, and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the defendant is not in the military service of New York State or of the United States as that term is defined in either the State or Federal statutes.

X [signature]
Muriel Schultz

Subscribed and sworn to before me, a notary public, on this 26 day of MArch, 2024.

Notary Public

Job # 285122

Client Reference: John C. Theodorellis 3 of 9

NANCY MANZELLA
Notary PUBLIC: State of New York
No.01MA6083790
Qualified in Suffolk County
Commission Expires 11/25/26

*TMS Services Inc, 977 N. Broadway, Massapequa, NY 11758 License: 2112432-DCA*

**Supreme Court State of New York, County of Nassau**

Steven Makowsky

Plaintiff(s),

vs.

County of Nassau, et al

Defendant(s).

Index Number: 602091/2024
Filed On: 02/05/2024
Court Date:

AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau ss:

I, Muriel Schultz, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York. That on 3/26/2024 at 11:27 AM at 1490 Franklin Avenue, Mineola, NY 11501, deponent served the within Notice of Electronic Filing, Summons and Verified Complaint bearing Index # 602091/2024 on Nassau County Police Department Joseph Checco Defendant therein named (the intended recipient).

SUITABLE AGE PERSON: By delivering a true copy of each to PSA Eilenberg Shield# 223, Co-Worker / Authorized a person of suitable age and discretion. That person was also asked by deponent whether said premises was the Defendant's Business within the state and the reply was affirmative.

On 3/26/2024 Deponent also enclosed a copy of same in a postpaid sealed wrapper properly addressed to Defendant at Defendant's Business at 1490 Franklin Avenue, Mineola, NY 11501 by First Class Mail marked Personal & Confidential and deposited said wrapper in (a post office) official depository under exclusive care and custody of the United States Postal Service within New York State.

DESCRIPTION: Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows:

Gender: Female Race/Skin: White Age: 36 - 50 Yrs. Weight: Over 200 Lbs. Height: 5ft 4in - 5ft 8in Hair: Brown Glasses: No Other:

COMMENTS:

MILITARY SERVICE: I Asked the Person Spoken to whether defendant was in active military service of the United States or of the State of New York in any capacity whatever, and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the defendant is not in the military service of New York State or of the United States as that term is defined in either the State or Federal statutes.

X [signature]
Muriel Schultz

Subscribed and sworn to before me, a notary public, on this 26 day of March, 2024.

[signature]
Notary Public

Job # 285123

Client Reference: John C. Theodorellis 4 of 9

NANCY MANZELLA
Notary PUBLIC: State of New York
No.01MA6083790
Qualified in Suffolk County
Commission Expires 11/25/26

*TMS Services Inc, 977 N. Broadway, Massapequa, NY 11758 License: 2112432-DCA*

Supreme Court State of New York County of Nassau

Steven Makowsky

Plaintiff(s),

vs.

County of Nassau, et al

Defendant(s).

Index Number: 602091/2024
Filed On: 02/05/2024
Court Date:

AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau ss:

I, Muriel Schultz, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York. That on 3/26/2024 at 11:27 AM at 1490 Franklin Avenue, Mineola, NY 11501, deponent served the within Notice of Electronic Filing, Summons and Verified Complaint bearing Index # 602091/2024 on Nassau County Police Officer Christopher Costello Defendant therein named (the intended recipient).

SUITABLE AGE PERSON: By delivering a true copy of each to PSA Eilenberg Shield# 223, Co-Worker / Authorized a person of suitable age and discretion. That person was also asked by deponent whether said premises was the Defendant's Business within the state and the reply was affirmative.

On 3/26/2024 Deponent also enclosed a copy of same in a postpaid sealed wrapper properly addressed to Defendant at Defendant's Business at 1490 Franklin Avenue, Mineola, NY 11501 by First Class Mail marked Personal & Confidential and deposited said wrapper in (a post office) official depository under exclusive care and custody of the United States Postal Service within New York State.

DESCRIPTION: Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows:

Gender: Female Race/Skin: White Age: 36 - 50 Yrs. Weight: Over 200 Lbs. Height: 5ft 4in - 5ft 8in Hair: Brown Glasses: No Other:

COMMENTS:

MILITARY SERVICE: I Asked the Person Spoken to whether defendant was in active military service of the United States or of the State of New York in any capacity whatever, and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the defendant is not in the military service of New York State or of the United States as that term is defined in either the State or Federal statutes.

X Muriel Schultz
Muriel Schultz

Subscribed and sworn to before me, a notary public, on this 26 day of March, 2024.

Notary Public

Job # 285124

Client Reference: John C. Theodorellis 5 of 9

*TMS Services Inc, 977 N. Broadway, Massapequa, NY 11758 License: 2112432-DCA*

NANCY MANZELLA
Notary PUBLIC: State of New York
No.01MA6083790
Qualified in Suffolk County
Commission Expires 11/25/26

**Supreme Court State of New York, County of Nassau**

Steven Makowsky

Plaintiff(s),

vs.

County of Nassau, et al

Defendant(s).

Index Number: 602091/2024
Filed On: 02/05/2024
Court Date:

AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau ss:

I, Muriel Schultz, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York. That on 3/26/2024 at 11:51 AM at 240 Old Country Rd, 2nd floor, Mineola, NY 11501, deponent served the within Notice of Electronic Filing, Summons and Verified Complaint bearing Index # 602091/2024 on Sheriff's Department County of Nassau Defendant therein named (the intended recipient).

COUNTY AGENCY: A County Agency by delivering a true copy of each to Deputy Sheriff Herman (First Name Refused) personally; deponent knew said County Agency so served to be the County Agency described as the named Defendant and knew said individual to be the Deputy Sheriff thereof an authorized person to accept service of process.

DESCRIPTION: Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows:

Gender: Male Race/Skin: White Age: 51 - 65 Yrs. Weight: 161-200 Lbs. Height: 5ft 9in - 6ft 0in Hair: Black Glasses: No Other: Mustache and beard

COMMENTS:

X *Muriel Schultz*
Muriel Schultz

Subscribed and sworn to before me, a notary public, on this *26* day of *March*, 2024.

____________
Notary Public

Job # 285125

Client Reference: John C. Theodorellis 6 of 9

*TMS Services Inc, 977 N. Broadway, Massapequa, NY 11758 License: 2112432-DCA*

NANCY MANZELLA
Notary PUBLIC: State of New York
No.01MA6083790
Qualified in Suffolk County
Commission Expires 11/25/26

**Supreme Court State of New York, County of Nassau**

Steven Makowsky

Plaintiff(s),

vs.

County of Nassau, et al

Defendant(s).

Index Number: 602091/2024
Filed On: 02/05/2024
Court Date:

AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau ss:

I, Kevin McCarthy, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York. That on 3/27/2024 at 4:40 PM at 75 Washington Avenue , Lawrence, NY 11559, deponent served the within Notice of Electronic Filing, Summons and Verified Complaint bearing Index # 602091/2024 on Lawrence-Cedarhurst Fire Department, Inc. Defendant therein named (the intended recipient).

DOMESTIC CORP: A Domestic Corp by delivering a true copy of each to Brian Williams personally; deponent knew said Domestic Corp so served to be the Domestic Corp described as the named Defendant and knew said individual to be the Fireman thereof an authorized person to accept service of process.

DESCRIPTION: Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows:

Gender: Male Race/Skin: White Age: 36 - 50 Yrs. Weight: 161-200 Lbs. Height: 5ft 4in - 5ft 8in Hair: Brown Glasses: No Other:

COMMENTS: Glass door

X [signature]
Kevin McCarthy

Subscribed and sworn to before me, a notary public, on this 4 day of April, 2024.

[signature]
Notary Public

Job # 285126

Client Reference: John C. Theodorellis 7 of 9

*TMS Services Inc, 977 N. Broadway, Massapequa, NY 11758 License: 2112432-DCA*

NANCY MANZELLA
Notary PUBLIC: State of New York
No.01MA6083790
Qualified in Suffolk County
Commission Expires 11/25/26

**Supreme Court State of New York, County of Nassau**

Steven Makowsky

Plaintiff(s),

vs.

County of Nassau, et al

Defendant(s).

Index Number: 602091/2024
Filed On: 02/05/2024
Court Date:

AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau ss:

I, Kevin McCarthy, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York. That on 3/27/2024 at 4:40 PM at 75 Washington Avenue , Lawrence, NY 11559, deponent served the within Notice of Electronic Filing, Summons and Verified Complaint bearing Index # 602091/2024 on Joshua Kirschner, LCFD Defendant therein named (the intended recipient).

SUITABLE AGE PERSON: By delivering a true copy of each to Brian Williams, Co-Worker a person of suitable age and discretion. That person was also asked by deponent whether said premises was the Defendant's Business within the state and the reply was affirmative.

On 3/28/2024 Deponent also enclosed a copy of same in a postpaid sealed wrapper properly addressed to Defendant at Defendant's Business at 75 Washington Avenue , Lawrence, NY 11559 by First Class Mail marked Personal & Confidential and deposited said wrapper in (a post office) official depository under exclusive care and custody of the United States Postal Service within New York State.

DESCRIPTION: Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows:

Gender: Male Race/Skin: White Age: 36 - 50 Yrs. Weight: 161-200 Lbs. Height: 5ft 4in - 5ft 8in Hair: Brown Glasses: No Other:

COMMENTS: Glass door

MILITARY SERVICE: I Asked the Person Spoken to whether defendant was in active military service of the United States or of the State of New York in any capacity whatever, and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the defendant is not in the military service of New York State or of the United States as that term is defined in either the State or Federal statutes.

X_______________
Kevin McCarthy

Subscribed and sworn to before me, a notary public, on this 4 day of April, 2024.

_______________
Notary Public

Job # 285128

Client Reference: John C. Theodorellis 8 of 9

*TMS Services Inc, 977 N. Broadway, Massapequa, NY 11758 License: 2112432-DCA*

NANCY MANZELLA
Notary PUBLIC; State of New York
No.01MA6083790
Qualified in Suffolk County
Commission Expires 11/25/26

Supreme Court State of New York County of Nassau

Steven Makowsky

Plaintiff(s),

vs.

County of Nassau, et al

Defendant(s).

Index Number: 602091/2024
Filed On: 02/05/2024
Court Date:

AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau ss:

I, Kevin McCarthy, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York. That on 3/27/2024 at 4:40 PM at 75 Washington Avenue , Lawrence, NY 11559, deponent served the within Notice of Electronic Filing, Summons and Verified Complaint bearing Index # 602091/2024 on Deputy Chief Meyer Adler LCFD Defendant therein named (the intended recipient).

SUITABLE AGE PERSON: By delivering a true copy of each to Brian Williams, Co-Worker a person of suitable age and discretion. That person was also asked by deponent whether said premises was the Defendant's Business within the state and the reply was affirmative.

On 3/28/2024 Deponent also enclosed a copy of same in a postpaid sealed wrapper properly addressed to Defendant at Defendant's Business at 75 Washington Avenue , Lawrence, NY 11559 by First Class Mail marked Personal & Confidential and deposited said wrapper in (a post office) official depository under exclusive care and custody of the United States Postal Service within New York State.

DESCRIPTION: Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows:

Gender: Male Race/Skin: White Age: 36 - 50 Yrs. Weight: 161-200 Lbs. Height: 5ft 4in - 5ft 8in Hair: Brown Glasses: No Other:

COMMENTS: Glass door

MILITARY SERVICE: I Asked the Person Spoken to whether defendant was in active military service of the United States or of the State of New York in any capacity whatever, and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated. Upon information and belief I aver that the defendant is not in the military service of New York State or of the United States as that term is defined in either the State or Federal statutes.

X_______________________
Kevin McCarthy

Subscribed and sworn to before me, a notary public, on this 4 day of April, 2024.

Notary Public

Job # 285129

Client Reference: John C. Theodorellis 9 of 9

*TMS Services Inc, 977 N. Broadway, Massapequa, NY 11758 License: 2112432-DCA*

NANCY MANZELLA
Notary PUBLIC: State of New York
No.01MA6083790
Qualified in Suffolk County
Commission Expires 11/25/26